ACCEPTED
13-14-00644-CV
THIRTEENTH COURT OF APPEALS
CORPUS CHRISTI, TEXAS
7/9/2015 11:34:39 PM
CECILE FOY GSANGER
CLERK

No. 13-14-00644-CV

FILED IN
13th COURT OF APPEALS
CORPUS CHRISTI/EDINBURG, TEXAS
7/9/2015 11:34:39 PM
CECILE FOY GSANGER
Clerk

# IN THE COURT OF APPEALS
# FOR THE THIRTEENTH DISTRICT OF TEXAS

**LAREDO NATIONAL BANK D/B/A BBVA COMPASS BANK**
**Appellant,**
v.
**MYRNA ELIZABETH DE LUNA MORALES,**
**Appellee.**

--------------------

**On Interlocutory Appeal from the issuance of a Temporary Injunction
in Cause No. 2014-DCV-2962-A in the 107th Judicial District Court
of Cameron County, Texas,
the Honorable Benjamin Euresti, Jr., Presiding**

------------------------

**APPELLEE'S BRIEF**

**Hon. Philip Cowen**
**Law Office of Philip Cowen**
**500 E. Levee St.**
**Brownsville, Texas 78520**
**Tel. 956-541-6031**
**Fax 956-541-6872**
**email: ptchb@att.net**

**Hon. Noe Robles**
**Law Office of Noe Robles**
**23331 Tamm Lane**
**Harlingen, Texas 78552**
**Tel. (956) 440-8200**
**Fax (956) 440-8205**
**email: nrobelslawoffice@aol.com**

## NOTICE OF PARTIES

**Appellee:**

MYRNA ELIZABETH DE LUNA MORALES

Appellee's Counsel:

Hon. Philip Cowen
State Bar No. 24001933
Law Office of Philip Cowen
500 E. Levee St.
Brownsville, Texas 78520
Tel. 956-541-6031
Fax 956-541-6872
email: ptchb@att.net

Hon. Noe Robles
State Bar No. 17118250
Law Office of Noe Robles
23331 Tamm Lane
Harlingen, Texas 78552
Tel. (956) 440-8200
Fax (956) 440-8205
email: **nrobelslawoffice@aol.com**

**Appellants:**

Laredo National Bank D/B/A BBVA Compass Bank
Hon. Selim H. Taherzadeh*

Trial and Appellate Counsel for Appellant:

Selim H. Taherzadeh, Trial and Appellate Counsel
Taherzadeh, PLLC

5080 Spectrum Drive, Suite 1000 East
Addison, TX 75001
Tel. (469) 791-0445
Fax (469) 828-2772
st@taherzlaw.com

Michelle Peritore, Appellate Counsel
Taherzadeh, PLLC
5080 Spectrum Drive, Suite 1000 East
Addison, TX 75001
Tel. (469) 791-0445
Fax (469) 828-2772
mp@taherzlaw.com

* Both second amended and prior plaintiff's pleadings suggest that he is a defendant.

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Texas Rules of Appellate Procedure 39.1, Appellee does not request oral argument.

# TABLE OF CONTENTS

Page

Notice of Parties............................................................................ ii

Table of Contents..................................................... ..... v

Table of Authorities............................................... ...... v ii

Preliminary Statement.................................................... 1

Statement of Facts............................................ ............................ 3

ISSUES PRESENTED .................................................... 6

Summary of Argument .............................................. 7

Argument.................................................................. 9

**ISSUE#1: The District Court did not err when it issued a ......**    9
**temporary injunction to stop a forcible detainer action from**
**proceeding in the Justice Court.**

**Issue #2 Appellant has no Standing to ask this Court to declare ...**   28
**that Appellee has No Valid Cause of Action against Appellant or**
**Probable Right to Recovery on Trial on the Merits. Appellant is**
**effectively asking this court to issue an advisory opinion on the**
**merits of its defense. Appellant's brief, in general, is a request for**
**this court to issue an illegal advisory opinion, and as such should be**
**dismissed. Any relief sought in the brief should be denied as being**
**moot as the appeal is simply a request for an advisory opinion.**

**ISSUE# 3 The fact that this case is now set for trial on...................**   32
**August 10, 2015, with announcements and hearings on pending**
**motions set for August 6, 2015, moots any relief this Court may**
**provide. Therefore, the case should be dismissed.**

Prayer for Relief ............................................................... 35

Certificate of Service......................................................... 36

Certificate of Compliance....................................................37

v

# Appendix

Document                                                                   Page No.

A.      Deed of Trust CR542-565                                        1

B:       Portion of Transcript of Hearing on Temporary Injunction      25
         CR602-624

C       Defendant Compass Bank's Amended Answer CRSupP86-89          48

D:      Texas Business and Commerce Code SUBCHAPTER B.                52
        NEGOTIATION, TRANSFER, AND INDORSEMENT
        Sec. 3.201 through 3.204.

E:       Texas Business and Commerce Code 3.302(2)©                   54

F.       Note                                                          55

G.      Transfer of Lien                                              56

H.      Modification and Extension Agreement                          59

# TABLE OF AUTHORITIES

Supreme Court Cases

Alabama State Fed'n of Labor v. McAdory, 325 U.S. 450 (1945)..............29
Allen v. Wright, 468 U.S. 737 (1984)......................................29
Valley Forge Christian College v. Americans United for Separation............29
of Church and State, 454 U.S. 464 (1982)
Warth v. Seldin, 422 U.S. 490 (1975).......................................29


Texas Cases

Aguilar v. Weber,  72 S.W.3d 729 (Tex.App.-Waco 2002)................13, 14, 27
Bd. of Adjustment of City of San Antonio v. Wende, 92 S.W.3d 424..............34
 (Tex. 2002)
Butnaru v. Ford Motor Co., 84 S.W.3d 198 (Tex. 2002)....................................10
Cardinal Health Staffing Network, Inc. v. Bowen, 106 S.W.3d 230 ................11
(Tex. App.—Houston [1st Dist.] 2003)
City of Fort Worth v. Pastusek Indus., Inc., 48 S.W.3d 366 ..............................33
 (Tex. App.-Fort Worth 2001
Falcon v. Ensignia, 976 S.W.2d 336 (Tex.App.-Corpus Christi 1998)........14, 24
Firemen's Ins. Co. v. Burch, 442 S.W.2d 331 (Tex.1969)...................................29
Franklin Says. Ass'n v. Reese, 756 S.W.2d 14 (Tex.App.-Austin 1988).............11
Goggins v. Leo, 849 S.W.2d 373(Tex.App.-Houston [14th Dist.] 1993)............13
Haith v. Drake, 596 S.W.2d 194, 197 (Tex.Civ. App.—Houston........................18
[1st Dist.] 1980)
Hayter v. Fern Lake Fishing Club, 318 S.W.2d 912............................................12
(Tex.Civ.App.-Beaumont 1958)
Hernandez-Perez v. State, No. 01-09- 00801-CR, 2010 WL 2133935...............33
(Tex. App.—Houston [1st Dist.] May 27, 2010
Home Sav. Ass'n v. Ramirez, 600 S.W.2d 911.....................................................13
(Tex.Civ.App.-Corpus Christi 1980)
In re H&R  Block Fin. Advisors, Inc., 262 S.W.3d 896(Tex. App.-Houston...33,34
[14th Dist.] 2008
Johnson v. Fellowship Baptist Church, 1. 627 S.W.2d 203...................................17
(Tex.App.—Corpus Christi 1981)
McGlothlin v. Kliebert, 672 S.W.2d 231 (Tex.1984)...........................................18
Mitchell v. Armstrong Capital Corp., 911 S.W.2d 169 ....................13, 21, 24, 26
(Tex.App.-Houston [1st Dist.] 1995)
Morrow v. Corbin, 122 Tex. 553, 62 S.W.2d 641 (Tex.1933).............................29

Pinnacle Premier Props., Inc. v. Breton, 447 S.W.3d 558.......................................19
(Tex. App.-Houston [14th Dist.] 2014
Positive Feed, Inc. v. Wendt, Nos. 01-96-00614-CV & 01-96-01250-CV...........12
1998 WL 43321, *10 30 (Tex.App.-Houston [1st Dist.] Feb. 5, 1998)
Rus-Ann Dev., Inc. v. ECC, Inc., 222 S.W.3d 921 (Tex.App.-Tyler 2007).........11
Slay v. Fugitt, 302 S.W.2d 698 (Tex.Civ.App.-Dallas 1957)...............................13
Sparkman v. State, 968 S.W.2d 373 (Tex. App.-Tyler 1997).........................21, 25
Tex. Ass'n of Business v. Air Control Bd., 852 SW 2d 440 (Texas 1993) ..........29
Texas Employment Comm'n v. International Union of Elec., Radio................30
TMC Med., Ltd. v. Lasaters French Quarter P'ship, 880 S.W.2d 789.......17. 18
(Tex. App.--Tyler 1993)
 and Mach. Workers, Local Union No. 782,352 S.W.2d 252 (1961)
Trulock v. City of Duncanville, 277 S.W.3d 920 (Tex. App.—Dallas 2009)....33
Valley Baptist Med. Ctr. v. Gonzalez, 33 S.W.3d 821 (Tex. 2000)...................34
Williams v. Lara, 52 S.W.3d 171 (Tex. 2001)...............................................33,34
Yarto v. Gilliland, 287 S.W.3d 83 (Tex. App.-Corpus Christi 2009).......10, 22,24

Constitutions

Tex.Const. art. II, § 1 ...............................................................................29

Rules and Statues

Texas Business and Commerce Code Sec. 3.202(2)(c)......................................24
Texas Business and Commerce Code Sec. 3.203 ..............................................23
Texas Business and Commerce Code Sec. 3.204 ..............................................23
Tex. Pro. C. Sec. 22.002..................................................................................18
Tex. R. Civ. P. Rule 746 ..................................................................................17

No. 13-14-00644-CV


IN THE COURT OF APPEALS
FOR THE THIRTEENTH DISTRICT OF TEXAS


LAREDO NATIONAL BANK D/B/A BBVA COMPASS BANK
Appellant,
v.
MYRNA ELIZABETH DE LUNA MORALES,
Appellee.
--------------------

On Interlocutory Appeal from the issuance of a Temporary Injunction
in Cause No. 2014-DCV-2962-A in the 107th Judicial District Court
of Cameron County, Texas,
the Honorable Benjamin Euresti, Jr., Presiding

------------------------

TO THE HONORABLE JUSTICES OF THIS COURT:

Comes now, MYRNA ELIZABETH DE LUNA MORALES, hereinafter

referred to as Appellee, who submits this brief, pursuant to the provisions of the

Texas Rules of Appellate Procedure, in support of her request for this court to

sustain and affirm the 107th District Court's Temporary Injunction, and other

remedies, in cause number 2014-DCV-2962-A.

PRELIMINARY STATEMENT

This is an Appeal of Order Denying Appellant Compass Bank's Motion to

1

Dissolve an Order Granting a Temporary Injunction in cause no. 2014-DCV-2962-A.

On April 1, 2014, for various reasons alleged in Appellee's pleadings, an illegal and invalid foreclosure sale took place whereby Compass Bank through Trustees, who are also trial and appellant's counsel, attempted to sell property belonging to Appellee. There are a good many factual points which do not appear to be disputed. . On May 12, 2014, Appellee filed its Original Petition. CR 7. On June 4, 2014, Appellant Compass Bank filed its Motion to Dismiss and Motion for Sanctions. CR 59. On June 16, 2014, Appellant filed a Motion to Deny the Temporary Injunction. CR 241. On June 26, 2014, the Court entered an Order granting the Appellee's Request for a Temporary Injunction. CR 372. On August 1, 2014, Appellant filed a Motion for Summary Judgment. CR 522. On September 23, 2014, the Appellant filed a Motion to Dissolve Temporary Injunction Order or in the Alternative to Modify the Order. CR 667. On October 31, 2014, the Court entered an Order Denying the Appellant's Motion to Dismiss, Motion for Summary Judgment and Motion to Dissolve the Temporary Injunction. CR 684-86. While the subject matter of this appeal appears to be the Denying Appellant's Motion to Dissolve Temporary Injunction Order or In the Alternative to Modify the Ordered Entered and also the Order Denying Appellant's Motion to Dismiss and Order Denying Appellant's Motion for Summary Judgment Entered, all that can be appealed is the Order denying appellant's trial Motion to Dissolve Temporary Injunction. CR 684-86.

Although that may be the case, on March 16, 2015 Appellants, and Appellants' Counsel have filed a second motion to dissolve the temporary inunction, entitled Compass Bank's Second Motion to Dissolve Temporary Injunction Order. See Supplemental Clerk's Record, p. 4, hereinafter CRSupP4.. Appellant amended its answer Seven days ago on July 2, 2015.

CRSup86.Plaintiff amended her pleadings July 7, 2015. CRSupP91.

STATEMENT OF THE FACTS

On April 1, 2014,  Appellant Compass Bank, believing it had the right to exercise a power of sale noted in paragraph 22 of a January 24, 2006 Deed of Trust, but in fact not having the right to exercise the power of sale nor to appoint a substitute trustee,  illegally sold the property at issue to itself as sole bidder at a foreclosure sale.[1]  The record shows that Appellant Compass Bank had never had the Note and Deed of trust negotiated to it by Laredo Bank, although there is a claimed merger of the institution which is not explained anywhere within Appellant's brief, but is briefly noted. CR670–by merger claim.

Prior to the sale, Appellee had arranged more than once for the property to be sold but due to intransigence by Appellant Compass Bank, and Appellant's counsel, and perhaps misconduct, Appellee was not able to cure an alleged deficiency, nor to effect a  sale of her property.  Appellee relied to her detriment on assurances made to her.  That reliance also led to the situation she now fights. CR614.

Appellee never received notice of the sale as Appellant, with full knowledge of where Appellee was, sent notice through regular mails to the County of Mexico. CR627 –Appellee's statement attributed to Compass Bank that "It's not my problem that the  postal service in Mexico is not a good one.", also showing no notice of date of sale nor amount due.  Appellant never provided any amount for Appellant to pay to cure any deficiency.  Id. Appellant never provided a payoff amount to pay the amount in full.CR614.  Appellant's pleadings admit the

---

[1]The Deed of trust is not negotiated to Compass by Laredo National Bank. See, CR541-564, which contains no endorsement. As such, any Substitute's trustee's deed is invalid. CR260.

3

substance of these complaints, as well as the substance of a newly filed new claim of detrimental reliance and tortious interference with contract. CRSupP83 and 111. .

There is no argument that there s a Deed of Trust involving Appellee and Laredo National Bank. However, while the note is alleged to be in Compass Banks hands, for Compass Bank to be able to exercise the rights noted in Paragraph 22, the note needed to be negotiated to Compass and apparently has not been so negotiated. As such, there is actually no Parties Agreement between Compass and Appellee. There is no argument however, that on January 24, 2006, Myrna Elizabeth de Luna Morales ("Appellee") signed a 30-year loan agreement (the "Note" or "Loan") in which she agreed to repay $291,200.00 to Laredo National Bank in monthly installments of $1,937.37 beginning March of 2006. Appellee obtained the loan so that she could purchase a home located at 6503 Fountain Way, South Padre Island, TX 78597 ("Premises" or "Property"). CR 264.

No title passed at the sale as the trustees violated the terms of paragraph 22, and as the trustees were without authority, and as the trustees had orally granted approval for Appellee to sell the property to another. The foreclosure sale occurred on April 1, 2014 as noticed, and Appellant purchased the home for $308,000.00. CR 238. When the property was finally sold, it was sold at over $242000,00 below market value. RR27-31.

The Appellee's Original Petition was filed on May 12, 2014. CR 7. Appellant Compass Bank filed its Original Answer on May 23, 2014. CR 51. A temporary injunction hearing was held on May 27, 2014. As a result of a Rule 11 Agreement, the hearing was reset for June 5, 2014. CR 54. The temporary injunction hearing was held on June 5, 2014, and the temporary restraining order was extended to June 18, 2014. Appellant Compass Bank filed a Motion to

4

Dismiss and Motion for Sanctions on June 4, 2014. CR 59. On June 11, 2014, the Appellee filed its First Amended Petition. CR 194. On June 16, 2014, Appellant filed a Motion to Deny Temporary Injunction. CR 241. On June 26, 2014, Appellant filed a Second Motion to Deny Temporary Injunction. CR 376. The Trial Court entered an order granting a Temporary Injunction on June 26, 2014. CR 372. On July 28, 2014, Appellant filed its Second Motion to Dismiss. CR 508. On August 1, 2014, Appellant filed a Motion for Summary Judgment. CR 522. On September 9, 2014, Appellant filed a Motion to Dissolve Temporary Injunction Order or in the Alternative to Modify the Order. On October 31, 2014, the Trial Court entered an Order denying the Motion to Dissolve the Temporary Injunction. CR 684. On October 31, 2014, the Court also entered an Order denying Appellant's Motion to Dismiss and an Order Denying Appellant's Motion for Summary Judgment. CR 684-86. As a result, this Appeal ensued.

A good indication of the District Court's opinion about the strength of Compass Bank's position is reflected in the granting of a one time bond of $1000.00, rather than a monthly bond as proposed by Appellant's trial counsel. CR6659-660.

5

# ISSUES PRESENTED

ISSUE#1: The District Court did not err when it issued a temporary injunction to stop a forcible detainer action from proceeding in the Justice Court.

Issue #2 Appellant has no Standing to ask this Court to declare that Appellee has No Valid Cause of Action against Appellant or Probable Right to Recovery on Trial on the Merits. Appellant is effectively asking this court to issue an advisory opinion on the merits of its defense. Appellant's brief, in general, is a request for this court to issue an illegal advisory opinion, and as such should be dismissed. Any relief sought in the brief should be denied as being moot as the appeal is simply a request for an advisory opinion.

ISSUE# 3 The fact that this case is now set for trial on August 10, 2015, with announcements and hearings on pending motions set for August 6, 2015, moots any relief this Court may provide. Therefore, the case should be dismissed.

## SUMMARY OF THE ARGUMENT

The District Court did not err when it issued a temporary injunction to stop the forcible detainer (or perhaps forcible entry and detainer) action from proceeding in the Justice Court. Appellee establishes all three bases for issuance of a temporary injunction. Appellant's action in Justice Court should have been interrupted by the Appellee's claim in District Court. Forcible entry and detainer or forcible detainer action, as Appellant uses these interchangeably, would have removed Appellee from the place she calls her home. Case law shows that the loss of one's home is an irreparable injury, one for which there is no remedy at law. As such, there is good cause for the district court to issue the temporary injunction.

Not only does the Appellee have a cause of action against the Appellant with a more than probable right to recovery at a trial on the merits, Appellee cannot show a probable, imminent, and irreparable injury simply because the property in question is the property she considers to be her home.

Appellant seeks to have this court issue an advisory opinion declaring that its theory of tenancy at sufferance is superior to any other claim made by Appellee. Appellee has theories of its own which show that Appellant had no authority to exercise the power of sale, nor to appoint substitute trustees, but, again, just because these are good theories and may be dispositive on the merits

has no bearing on the matter at hand. All appellant has to do is to maintain a claim which has probable relief if evidence is adduced at trial to support the claims.

The facts and the law show that the Trial Court's order should be affirmed and that the injunction should remain in plain so long as the District Court finds that the situation requires it. It is up to Appellant to push this case forward, to trial, if need be. That is the quickest solution to the issues at hand and, if successful, will provide Appellant the shortest route to the relief Appellant seeks.

Finally, just because so much time has elapsed, and because trial is now set for August 10, 2015, this appeal is moot, and should be dismissed as asking this court to issue an advisory opinion.

**ISSUE#1: The District Court did not err when it issued a temporary injunction to stop a forcible detainer action from proceeding in the Justice Court.**

The Trial Court did not err in denying Appellant's Motion to Dissolve a Temporary Injunction because Appellant has no right to the immediate possession of the Premises and because Appellee's issues in her pleadings raise genuine title issues preventing a justice court from taking the case. The true issue here is not whether Appellee defaulted on her loan, but whether Appellant foreclosed on the Property in accordance with the Note and Deed of Trust, whether Appellant had the power of sale as a holder of the note, and whether Appellant prevented cure of a deficiency thus invalidating the sale. RR 29, CR 276. Part of the subject matter of the suit is the unlawful attempt to sale the property at a foreclosure sale when Appellant had no legal right to sell the property. Part of the suits has to do with how Appellee relied on promises and assurance by Appellant and then Appellant betrayed those promises. Part of the suits concerns the fact that such statements make Appellant effectively a fiduciary for Appellee. After the abortive foreclosure sale, Appellee had every legal right to remain in possession of the Property. And, on that same theory, Appellant had not right to to file a forcible detainer or forcible entry and detainer action in Justice Court in order to obtain possession of the Property. The June 26, 2014, District Court Temporary Injunction enjoining

proceeding on the forcible detainer action in Justice Court reflects the reality of an abortive foreclosure.  CR 372.

Standard of Review:

The standard of review for a court of appeals to review the appropriateness of a district court's issuance of a temporary induction is for abuse of discretion.[2] See Yarto v. Gilliland, 287 S.W.3d 83, 88  (Tex. App.-Corpus Christi 2009, no pet.)

Texas law is clear that the burden of proof for a temporary injunction is on the party seeking the injunction. To obtain a temporary injunction, a party must plead and prove three specific elements

(1) a cause of action against the defendant;

(2) a probable right to recovery following a trial on the merits; and

(3) a probable, imminent, and irreparable injury in the interim See Yarto, at 88. See also, Appellant's reference to  Butnaru v. Ford Motor Co., 84 S.W.3d 198, 204 (Tex. 2002), which refers to questions about temporary injunctions, but actually involves a dispute about whether the Texas Motor Vehicle Board has exclusive jurisdiction over a prospective car dealership transferees' claims that raise an issue

---

[2]Appellant appeals the denial of the motion to dissolve the temprary injunction, not the issuance of the injunction itself.  As such, this court may not have standing. See Brief, at 1, first sentence.

about how to construe the Texas Motor Vehicle Commission Code. Id., at 201.

A temporary injunction is an extraordinary remedy that does not issue as a matter of right. Butnaru, 84 S.W.3d at 204. An injury is "irreparable" if the injured party cannot be adequately compensated in damages, <u>Cardinal Health Staffing Network, Inc. v. Bowen</u>, 106 S.W.3d 230, 236- 37 (Tex. App.—Houston [1st Dist.] 2003, no pet.) (en banc).

Appellee claims that she has meet all these burdens, and while Appellant did not claim that the trial court abused his discretion, claims that had Appellant so charged, the trial court in fact did not abuses its discretion in denying the motion to dissolve the temporary injunction.

**Loss of home is an irreparable injury.**

Much of Appellant's brief argues that Appellee can not prove any irreparable injury, almost ignoring the reference by Appellee in her pleadings that the property is her home. The loss of a home is an irreparable injury, for which Appellee cannot be adequately compensated in damages. <u>Rus-Ann Dev., Inc. v. ECC, Inc.</u>, 222 S.W.3d 921, 927 (Tex.App.-Tyler 2007, no pet.); see <u>Franklin Says. Ass'n v. Reese,</u> 756 S.W.2d 14, 15-16 (Tex.App.-Austin 1988, no writ) (op. on reh'g) ("Since it is obvious that appellee would probably be injured if the property were foreclosed and sold, the only question here is whether the trial court

11

erred in determining there was a probable right of recovery."); <u>Hayter v. Fern Lake Fishing Club</u>, 318 S.W.2d 912, 914 (Tex.Civ.App.-Beaumont 1958, no writ) (finding that actions affecting one's use and enjoyment of his home is an irreparable injury); see also <u>Positive Feed, Inc. v. Wendt</u>, Nos. 01-96-00614-CV & 01-96-01250-CV, 1998 WL 43321, \*10, 1998 Tex. App. LEXIS 774, \*30 (Tex.App.-Houston [1st Dist.] Feb. 5, 1998, pet. denied) (mem. op.) ("We hold that loss of enjoyment or the reasonable use of one's home can be an irreparable injury for purposes of injunctive relief."). The property in question is Appellant's South Padre Island home.

**Pleadings provide Specific Evidence of Title Dispute**

There is a probable right to recovery based on numerous claims in Appellee's petition, originally, and as amended. While Injunctive relief brought through a District Court to stop an eviction through a forcible detainer action might be appropriate in some instances, where it is clear as her that title issues are in play which need to be determined prior to any forcible entry and detainer or forcible detainer action, the Justice Court has no jurisdiction. Very simply, because there are specific titles issues at play in in this suit in District Court, and where the Justice Court has notice of these issues, the justice court cannot act. The pleadings in this case are specific evidence of a title dispute.

12

In Aguilar v. Weber, 72 S.W.3d 729, 734-35 (Tex.App.-Waco 2002, no pet.), the Aguilar court, found "specific evidence" of a title dispute based on the party's assertions in the pleadings, rather than on evidence to support those assertions. Mitchell v. Armstrong Capital Corp., 911 S.W.2d 169, 171 (Tex.App.-Houston [1st Dist.] 1995, writ denied). This court, in Yarto, above, noted Aguilar with approval. See, Yarto, fn. 43.

The Aguilar court also noted specifically that jurisdiction of forcible detainer actions is expressly given to the justice court of the precinct where the property is located and, on appeal, to county courts for a trial de novo. See Tex. Prop.Code Ann. § 24.004 (Vernon 2000); Goggins v. Leo, 849 S.W.2d 373, 375 (Tex.App.-Houston [14th Dist.] 1993, no writ); Home Sav. Ass'n v. Ramirez, 600 S.W.2d 911, 913 (Tex.Civ.App.-Corpus Christi 1980, writ ref'd n.r.e.). The Aguilar court also noted that a justice court is expressly denied jurisdiction to determine or adjudicate title to land. Tex. Gov't Code Ann. § 27.031(b) (Vernon Supp.2001); Slay v. Fugitt, 302 S.W.2d 698, 701 (Tex.Civ.App.-Dallas 1957, writ ref'd n.r.e.). Thus, a justice court, has no jurisdiction to determine the issue of title to real property in a forcible detainer suit. Tex.R. Civ. P. 746; See Mitchell , 911 S.W.2d at 17.

13

**In the instant case, the pleadings themselves are evidence that a title dispute is at issue.**

In the case at hand, Appellees pleadings provide the specific evidence of a title dispute. As such, the Justice Court has no jurisdiction. Id. In this case, any justice court will lack jurisdiction because Appellee's pleadings are themselves specific evidence of a title dispute, as was the case in Mitchell, 911 S.W.2d at 169; see also Falcon v. Ensignia, 976 S.W.2d 336, 338 (Tex.App.-Corpus Christi 1998, no pet.). Appellee's Petition and Amended Petitions have always disputed the alleged default and challenged the right to possession under the contract under various theories, alleging lack of authority under the Deed to exercise the power of sale, and alleged lack of authority because Appellee was never provided the opportunity to cure any alleged deficiency. Determining the right of possession necessarily involves a title inquiry into the contractual provisions of Section 19 and 22 of the deed, as well as the problems with the failure to allow Appellee to cure on the various bases she claims in her pleadings and claimed at the temporary injunction hearing. See, Aguilar, at 735. See also Aguilar at 733-734 relating to the fact that a forcible detainer[3] case in inappropriate unless there is a

_____

[3]A various points in the brief, Appellant seems to use these terms interchangeably. They are not interchangeable. Brief at 1, Forcible detainer; brief at 6, 10, 11, forcible entry and detainer. It is not clear from the record exactly what Appellant tried to file in the justice court, as

14

landlord-tenant relationship.

Any justice court would have to determine whether Appellant legally was empowered to exercise the power of sale, and whether there was, in effect, an opportunity to cure, under Section 19 of the deed of trust, and if not whether that failure removed the authority by anyone under the deed of trust to sale the property under Section 22. Justice courts are not meant to decide such issues. District courts are. They certainly do not try trespass to try title cases. Thus, it was proper for the District Court to enjoin any action of removal under any authority claimed by Appellant that a justice court had to evict Appellee. Thus, the District Court was correct in enjoining Appellant from trying to use a justice court to removed Appellee.

**Appellee has numerous causes of actions and all her claims are justicible and there are sufficient allegations to support taking the case to trial.**

Under Texas law, a District Court can enjoin parties from proceeding on a forcible detainer or forcible entry and detainer action pending in Justice Court, and in support Appellant states. Now, months after the hearing on setting aside

---

Appellant has not provided this court with a copy if its pleadings submitted to a justice of the peace court. As Aguilar show, no forcible detainer proceeding could be effected. Under the same case, the specific evidence of the pleadings themselves, with the claims made, which are cognizable under Texas Law, are themselves evidence of a title dispute.

the temporary injunction, Appellant amended its answers. These were just recently entered into the record. CRSupP86-89. The amended answer, other than the general denial, does not assert any affirmative defenses or any defenses to the issue of wrongful foreclosure, reliance issues within the DTPA which may survive the DPTA claim on their own, and the trespass to try title claim. By the very act of amending its answer, Appellant has conceded that those claims were justiciable at the time the petition and amended petition was filed.

Since the inception of this appeal, on July 7, 2015, Appellee/Plaintiff has added Substituted Trustee, present trial and appellate counsel, Selim H. Taherzadeh, a party to the lawsuit. CRSupP91. It appears that both appellant and Selim H. Taherzadeh are being sued now for damages based on detrimental reliance based on Selim H. Taherzadeh and other's actions. CRSupP91. Both are also being sued for tortious interference with contract. CRSupP103. Selim H. Taherzadeh is now also being sued for breach of fiduciary duty. Selim H. Taherzadeh is also being sued for negligence. CRSupP101. Whether acting in his own capacity or for Compass, it appears that the pleadings essentially now include Selim H. Taherzadeh as a defendant. As such, he is technically and Appellant to this suit. Thus, as to breach of fiduciary duty, Appellant's counsel has what he wanted, a claim that now includes the trustee as violating a fiduciary duty, as well

16

as a claim that Compass Bank was also defacto a fiduciary.

**Appellees claims are proper claims with remedies provided in law**

There is no question that there is a cause of action pending concerning the property at issue. In its brief, Appellant argues incorrectly that the Justice Court alone has the jurisdiction to determine the immediate possessory rights of the parties. Brief at 1, referring to TMC Med., Ltd. v. Lasaters French Quarter P'ship, 880 S.W.2d 789, 791 (Tex. App.--Tyler 1993). Nothing in this case suggests that title disputes in District Court can proceed The problem with Appellant's arguments and cases is that they deal with Landlord Tenant relationships, and not with issues involving whether a person has legally and effectively lost title. French Quarter P'ship shows explicitly in its holding that questions of title are not appropriate issues for a justice of the peace courts to determine. Id, 880 S.W.2d 791, referring to Tex. R. Civ. P. Rule 746 and Johnson v. Fellowship Baptist Church, 1. 627 S.W.2d 203, 204 (Tex.App.—Corpus Christi 1981, no writ). In French Quarter P'ship the court noted that in that case "the tenant's right to possess leasehold property does not present any question of title, disputes regarding such possession are subject to the jurisdiction of the appropriate justice court, whose jurisdiction in these types of action is exclusive. Id., referring to Haith v. Drake, 596 S.W.2d 194, 197 (Tex.Civ. App.—Houston

[1st Dist.] 1980, writ ref'd n.r.e.). <u>McGlothlin v. Kliebert</u>, 672 S.W.2d 231, 232 (Tex.1984). This case is more than a landlord/tenant case. Any wrongful foreclosure suit is essentially a title dispute, the main arguments being whether the forecloser had both the right to foreclosure but also whether the forecloser did it right, and, additionally, whether the person attempted to be foreclosed on has any defenses against the foreclosure, including whether the one foreclosed upon acted in reliance on the actions and promises made by the one foreclosing or his or her agents. Because the justice court does not have the skills to handle title cases, nor has the jurisdiction to do so, the district court was right in enjoining the exercise of the justice court's jurisdiction. Id., 880 S.W.2d 791. Here, in the very pleadings asserted by Appellee/ Plaintiff, and wronged party, there is a clear showing that the justice court is without jurisdiction to proceed in the cause because the suit is a title dispute. Certainly, a trespass to try title case is a title suit. Under the Texas Property Code, Sec. 22.002, any evidence of title is sufficient to support the cause of action, and a final judgment against the other party establishes title or right to possession of real property and that judgment is conclusive against the party from whom the property is recovered and against a person claiming the property through that party by a title that arises after the action is initiated. Tex. Pro. C. Sec. 22.002. Plaintiff /Appellee's pleadings are sufficient evidence in themselves to

18

destroy the jurisdiction of the justice of the peace court. This is not landlord-tenant dispute over possession of the leased premises, which is the subject matter of Appellant's cases.

Section 22 of the Deed of Trust references to the Borrower becoming a Tenant at sufferance after foreclosure is a boilerplate statement which very likely has been incorporated into a Texas Deed of Trust to avoid litigation. However, nothing in Section 22 relates to whether the sale by a trustee or substitute trustee is presumptively correct in form, nor does its provide any guidance to a District Court or to this court when there are title issues present in a District Court case. Plaintiff's Pleadings themselves are specific evidence of a title dispute. The District Court was correct in not allowing Appellant to try to evict Appellee, as it is clear that a less learned judge, dealing only with petty issues, would not have the ability to sort out title issues, nor should he or she be allowed to. See Pinnacle Premier Props., Inc. v. Breton, 447 S.W.3d 558, 564 (Tex. App.-Houston [14th Dist.] 2014, no pet.) (op. on reh'g) (holding that no intertwined title issue existed when the defendants' title dispute was based entirely on contentions that the foreclosure sale was conducted improperly and that the lender had assigned the note to another bank). Here, there is more than a claim about a foreclosure sale that was conducted improperly; there is also a claim that it was conducted

19

illegally. Id. There is also a trespass to try title claim, a claim that Appellant would not allow Appellee to cure, and other similar claims which go directly to the issue of title. Appellee argues in her pleadings that if Appellant had permitted her to cure, and had given her the figures she needed, there would have been no default.

Appellee's First Amended Pleadings, pps. 4 and 6, alleged violations of Paragraph 19 "the right to cure" "prior to foreclosure", "Plaintiff was willing and able to pay-off the entire note. See CR194-209, but after this the page numbers of the actual Petition are used. Defendant ignored her pleas and instead foreclosed on the home" –all these concern questions of title, and not just the formalities of the foreclosure. Page 7 of the First Amended pleadings reflects a genuine contract dispute, both based on course of dealings, and on the contract, assuming it has been negotiated to Compass Bank. Appellee also claimed that she as "Plaintiff sought to exercise her rights and notified Bank and its agents that she was willing and able to cure the default and/or pay-off the total mortgage debt. The Bank acting through its agent declined and denied Plaintiff her rights as a Borrower thereby breaching the contract with Plaintiff." Id. When these claims are stacked up against the strength of the alleged tenant at sufferance claim, Appellant's tenant at sufferance argument is simply irrelevant.

Evidence of a title dispute is also raised in Appellee's pleadings in the issues revolving around the DTPA claim, specifically the reliance and recision issues contained therein. See, page 4 of Amended Pleading, "The Bank agreed to give Plaintiff (Appellee) quiet enjoyment of her home and that it would exercise due diligence and good faith in the performance of their fiduciary duties to plaintiff under the terms of the contracts and Deed of Trust." See also, the reliance issue, "Plaintiff relief on Defendants to treat her fairly and accordingly." See also the Breach of Conduct Claim, p. 6. wherein it notes that the Trustee failed to specify the date and the deadline on which buyer in default had to comply and cure the default." See also, "The Bank acting through its agents declined and denied Plaintiff her rights as a Borrow thereby breaching the contract with Plaintiff." P. 7, 1ˢˢᵗ Amended Pleadings. Here, explicitly, thus, there is an issue concerning title as it relates to the contract between the alleged parties. Such title disputes take away a justice court's jurisdiction. See Sparkman v. State, 968 S.W.2d 373, 377-78 (Tex. App.-Tyler 1997, no pet.) (citing Mitchell, 911 S.W.2d at 170 (holding appellant raised title as an issue in the justice court and county court at law by asserting that substitute trustee's deed held by appellee was void, and by specifically giving notice that litigation was pending in the district court to set aside the non-judicial foreclosure sale). Because, in this case a genuine title

21

dispute has been raised in the district court in Appellee's pleadings, the justice court cannot take jurisdiction. The District Court was correct in enjoining such action for that reason. Furthermore, Appellant cannot just walk into the Justice Court and pretend there is no suit pending in District Court. A justice court might accept the suit anyway, and evict Appellant applying bad law. That is why District Court's enjoin these types of actions in these types of cases. The very fact of filing the pleadings or the very fact of the counterclaims by appellant raises title issues. Further, Appellants are on notice that litigation is pending in a district court to set aside the non-judicial foreclosure sale and part of the basis of that set aside is a dispute concerning title. See Yarto v. Gilliland, 287 S.W.3d 83, 87 (Tex. App.-Corpus Christi 2009, no pet.), referring to Mitchell, 911 S.W.2d at 170.

**It appears that Appellee will win as Appellant had no right to exercise power of sale**

Furthermore, on the face the Deed of Trust which Appellant brings to this court does not reflect that Appellant has the right to exercise the power of sale. Appellant claims to be the holder of the note, but please note that Appellant has not provided this court nor the District Court anything in discovery which evidences that the note for which Laredo National Bank was a holder was ever negotiated to them. See, Appendix p. 55, the Note, Appendix p. 56 a sample of a

prior transfer of the note to Laredo National Bank by a prior holder. In the

Modification noted in Appendix 59, while Compass Bank claims it now owns the

note, it does not stated that the Laredo National Bank has negotiated the note to

them by endorsing it, as the Transfer does on Appendix 55. No transfer or

negotiation of the note is evidenced here in this case. Neither the note, nor the

deed of trust, has been negotiated to Defendant/Appellant Compass Bank. The

Note lists The Laredo National Bank as the lender. See, Note, Appendix, page 56.[4]

The Note recognized that the Deed of Trust and the Note are a "Security

Instrument." The Deed of Trust notes that Jose C. Gonzalez is the trustee.

Compass Bank and someone other than Jose Gonzalez are involved in the

foreclosure, not the Laredo National Bank. Compass Bank claims to be a

successor by Merger to Laredo National Bank. The documentation presented to

both this court and the District court does not reflect compliance with Texas

Business and Commerce Code Sec. 3.203, and 3.204 (indorsement is a signature

which is made for the purposes of negotiating the instrument. See also, Sec.

3.302(2)© HOLDER IN DUE COURSE, referring in (2) to "the holder took the

instrument:"© Except to the extent a transferor or predecessor in interest has

---

[4]Counsel would love to provide this court a copy of the entire Note. However, Appellee does not have her copy. And, Appellant has not provided, through Discovery, any copy showing or evidencing an endorsement negotiated the note to Companss by Laredo National Bank.

rights as a holder in due course, a person does not acquire rights of a holder in due course of an instrument taken: (1) by legal process or by purchase in an execution, bankruptcy, or creditor's sale or similar proceeding;(2) by purchase as part of a bulk transaction not in ordinary course of business of the transferor; **or (3) as the successor in interest to an estate or other organization.** Formalities are important.

Appellant claims that none of the theories under which Appellant claims to argue that the District Court erred has any merit. See Yarto v. Gilliland, 287 S.W.3d 83, 87 (Tex. App.-Corpus Christi 2009, no pet.); Mitchell, 911 S.W.2d at 170. Under Sec. 3.202(2)© Compass bank is simply not the holder who may exercise the power of sale.

**Yarto and this Case are similar**

This case is a miniature version of Yarto. The case in Yarto is very instructive and should provide this court with the rationale for rejecting any claims that the trial court erred in granting the injury. In Yarto, Robert Yarto, referring to Falcon v. Ensignia, 976 S.W.2d 336 (Tex. App.-Corpus Christi 1998, no pet.) maintained that the Gillilands failed to bring the justice court's jurisdiction into question because they presented no specific evidence of a title dispute. Id., 287 S.W.3d at 87. In Falcon, Appellee Ensignia purchased a motel from Hernandez

and subsequently brought a forcible entry and detainer action against the Falcons in a justice court. Falcon, 976 S.W.2d at 336. The Falcons, who had been managing and residing in the motel for some time, refused to vacate upon Ensignia's request.. Id., 976 S.W.2d at 337.The Falcons filed a written answer in the justice court, wherein they alleged that they had entered into an oral contract for the purchase of the property from an Hernandez prior to Ensignia's purchase of the property. Id., 976 S.W.2d 337-38,The Falcons never produced any writing evidencing this conveyance. Id. Ensignia, on the other hand, filed a copy of the warranty deed and vendor's lien evidencing his purchase and ownership of the property. Id. The justice court rendered judgment in favor of Ensignia, and the Falcons appealed to a county court for a trial de novo. Id. After Ensignia moved for summary judgment, and the Falcons failed to file a response, the county court granted summary judgment in favor of Ensignia. Id. The Falcons then appealed to this Court, arguing that the lower courts were without jurisdiction to determine title. Id. This Court in Falcon rejected the argument, stating:

> We do not believe a genuine title dispute was ever raised in either court. Falcon referred to an oral agreement between him and Gonzalez [sic], but such agreement is unenforceable as a matter of law. Specific evidence of title dispute is required to raise an issue of a justice court's jurisdiction. Without the Falcons having presented specific evidence to raise a genuine title dispute, the jurisdiction of the court was never at issue.

Id. at 338 (emphasis added) (citing Sparkman v. State, 968

S.W.2d 373, 378 (Tex.App.-Tyler 1997, pet. ref'd)) (citing
Mitchell v. Armstrong Capital Corp., 911 S.W.2d 169, 171
(Tex.App.-Houston [1st Dist.] 1995, writ denied)).

That lack of a genuine title dispute was not present in Yarto, as it is not present here. Here there is a genuine title dispute based on the pleadings. The Yarto's Court's demand for specific evidence of a title dispute, referred to in Falcon, above, rested on Sparkman v. State, wherein the Tyler Court of Appeals—citing the Houston First Court of Appeals' opinion in Mitchell v. Armstrong Capital Corporation as its example —observed that "courts have required specific evidence of a title dispute before determining that a title dispute deprived a justice court of jurisdiction in an action for forcible entry and detainer." Sparkman, 968 S.W.2d at 378 (citing Mitchell v. Armstrong Capital Corp., 911 S.W.2d 169, 171 (Tex.App.-Houston [1st Dist.] 1995, writ denied)). The Yarto court posed this question: "what specific evidence did the Mitchell court really require? 287 S.W.3d 83, 87 Id., Yarto, at 87. It answered that question by noting that in Mitchell, Armstrong Capital first prevailed on a forcible detainer action against Mitchell in a justice court, and then later in a county court. Id., 911 S.W.2d at 171. Mitchell appealed, arguing that the county court did not have subject-matter jurisdiction over the case. Id. In addressing the argument, the court

26

of appeals stated that "[i]f it becomes apparent that a genuine issue regarding title exists in a forcible detainer suit, the [justice or county] court does not have jurisdiction over the matter."Id. The court then ruled in Mitchell's favor, stating:

> Appellant Mitchell raised title as an issue in the justice court and county court at law by asserting that the Substitute Trustee's Deed held by Armstrong Capital was void, and by specifically giving notice that litigation was pending in the 268th District Court to set aside the non-judicial foreclosure sale. Because a "title issue" was involved in the courts below, they had no subject matter jurisdiction over the case. 911 S W. 2d at 171.
> Id., Yarto, at 88.

The Yarto Court noted that the Mitchell opinion does not reference any evidence Mitchell presented to support her claim that Armstrong Capital's deed was void; rather, the opinion merely establishes that Mitchell was able to raise a title dispute through her assertions and notice of pending litigation. The court then held that it interpreted "specific evidence" as consisting of nothing more than the various assertions that comprise a party's title claim, and concluded that "specific evidence" of a title dispute exists when through those assertions, a party has asserted a basis for title ownership that is not patently ineffective under the law and is intertwined with the issue of immediate possession. The Yarto court noted that The Waco Court of Appeals in Aguilar v. Weber, 72 S.W.3d 729, 734-35 (Tex.App.-Waco 2002, no pet.). Accordingly, the Aguilar court, like the Mitchell court, found "specific evidence" of a title dispute based on the party's assertions, rather than on evidence to support those assertions

27

**Conclusion.**

There is nothing patently ineffective under the law concerning Appellee's pleadings. Id., Yarto, generally. All factors to support maintaining the temporary injunction are present.

There is a cause of action here; in fact, many, as evidenced in Appellee's pleadings. The pleadings themselves are evidence of a title dispute. Finally, appellees loss of her South Padre Island home is something which courts have found to be irreparable

Although Appellant does not once claim that the trial court abused his discretion in granting the temporary injunction, it is clear that the trial court did not abuse its discretion at all, but, after careful consideration of the evidence after a fifty page hearing, ruled against Appellant. The temporary injunction should remain in place, until the conclusion of the trial not set for August 10, 2015.

**Issue #2 Appellant has no Standing to ask this Court to declare that Appellee has No Valid Cause of Action against Appellant or Probable Right to Recovery on Trial on the Merits. Appellant is effectively asking this court to issue an advisory opinion on the merits of its defense. Appellant's brief, in general, is a request for this court to issue an illegal advisory opinion, and as such should be dismissed. Any relief sought in the brief should be denied as being moot as the appeal is simply a request for an advisory opinion.**

**Standard of Review**

Standing is never presumed and cannot be waived. Tex. Ass'n of Business v.

28

<u>Air Control Bd.</u>, 852 SW 2d 440 - Tex: Supreme Court 1993.   One limit on courts' jurisdiction under both the state and federal constitutions is the separation of powers doctrine. See Tex.Const. art. II, § 1; <u>Valley Forge Christian College v. Americans United for Separation of Church and State</u>, 454 U.S. 464, 471-74 (1982); <u>Warth v. Seldin</u>, 422 U.S. 490, 498 (1975). Under this doctrine, governmental authority vested in one department of government cannot be exercised by another department unless expressly permitted by the constitution. Thus the Texas Supreme Court and other Texas courts  have construed the Texas separation of powers article to prohibit courts from issuing advisory opinions because such is the function of the executive rather than the judicial department. <u>Tex. Ass'n of Business v. Air Control Bd.</u>, 852 SW 2d 440 - Tex: Supreme Court 1993), referring to <u>Firemen's Ins. Co. v. Burch</u>, 442 S.W.2d 331, 333 (Tex.1969); <u>Morrow v. Corbin</u>, 122 Tex. 553, 62 S.W.2d 641, 644 (Tex.1933).

The distinctive feature of an advisory opinion is that it decides an abstract question of law without binding the parties. <u>Alabama State Fed'n of Labor v. McAdory</u>, 325 U.S. 450, 461 (1945); <u>Firemen's Ins. Co.</u>, 442 S.W.2d at 333. An opinion issued in a case brought by a party without standing is advisory because rather than remedying an actual or imminent harm, the judgment addresses only a hypothetical injury. See <u>Allen v. Wright</u>, 468 U.S. 737, 751 (1984). Texas courts,

29

like federal courts, have no jurisdiction to render such opinions.

Subject matter jurisdiction is an issue that may be raised for the first time on appeal; it may not be waived by the parties. Texas Employment Comm'n v. International Union of Elec., Radio and Mach. Workers, Local Union No. 782, 163 Tex. 135, 352 S.W.2d 252, 253 (1961)--- standing is a component of subject matter jurisdiction, and it cannot be waived and may be raised for the first time on appeal.

Argument

It appears that the entire brief is actually a request for an advisory opinion. The strength of the brief, according to its author is the absolute superior rights Appellant has when compared to Appellee. Appellant's issue is basically one that requires the issuance of an advisory opinion. The specific language is Appellee has no Cause of Action Against Appellant or Probable Recovery on Trial on the Merits. See Brief, at 13. From Pages 13 through 32, Appellant tells this court that Appellee has no chance to win and finishes with a request to overturn the injunction because it cases is so strong as compared to Appellee's. Brief, at 13-32.

This certainly is a request for an advisory opinion. It is tantamount to Appellant arguing, "Listen Court, these guys have no chance to win at all in the end, so order the District Court to stop the injunction and let us go after the

30

property."

Similarly, pages 8 through 13 set up a predicate which tells this court that because Appellant's case has no merit and for that reason the injunction should not stand.

Very simply, this court has no jurisdiction to hear this case as briefed. It should be dismissed with prejudice with all costs charged to Appellant. alternative relief sought in the brief should be denied as being a request for an advisory opinion.

Recall that no one has been to the Justice Court. We have no order of possession. We have a reluctant Defendant who seeks to win through legal maneuvering rather than on the merits. Were Appellant's claims of any merit, certainly they would have prevail on the merits in the various dispositive motions which Appellants have filed which the district court has consistently denied. Asking this court to rule that Appellant's case is better than Appellee's case is merely a ruse to get this court to issue an illegal advisory opinion. For that reason, the case should be dismissed.

**ISSUE# 3 The fact that this case is now set for trial on August 10, 2015, with announcements and hearings on pending motions set for August 6, 2015, moots any relief this Court may provide. Therefore, the case should be dismissed.**

This case is almost over. It has gone on for about a year and a half. The District Court has set the matter for trial next month. There is no relief this court can grant Appellee, in the short run, which would mean anything.

As a practical matter, for whatever reasons, the temporary injunction has been in place and has lasted for over a year. Appellant did not file a brief on the issue until December 30, 2014. The record does not explain what happened between then and May 5, 2015 when Appellee asked for an extension of time to file her brief.

Any relief granted this court may only complicate the litigation as there is every likelihood that Appellee will prevail at trial on various issues, and may even be able to obtain partial summary judgment, prior to trial, on several issues, such as whether Appellant had the power of sale, and whether appellant's pleadings are an admission of tortious interference with contract, breach of contract, and violation of a breach of fiduciary duty. Appellee will certainly be working on such

32

potential partial relief before trial.

Standard of Review

An issue may become moot when a party seeks a ruling on some matter that, when rendered, would not have any practical legal effect on a then-existing controversy. See In re H&R Block Fin. Advisors, Inc., 262 S.W.3d 896, 900 (Tex. App.-Houston [14th Dist.] 2008, orig. proceeding); City of Farmers Branch v. Ramos, 235 S.W.3d 462, 469 (Tex. App.-Dallas 2007, no pet.). When an appeal is moot, we must set aside the judgment and dismiss the cause. City of Fort Worth v. Pastusek Indus., Inc., 48 S.W.3d 366, 371 (Tex. App.-Fort Worth 2001, no pet.). The mootness doctrine also implicates subject-matter jurisdiction. Hernandez-Perez v. State, No. 01-09- 00801-CR, 2010 WL 2133935, at *1 (Tex. App.—Houston [1st Dist.] May 27, 2010, no pet.) (mem. op.) (citing Trulock v. City of Duncanville, 277 S.W.3d 920, 923 (Tex. App.—Dallas 2009, no pet.)). A case is moot if a controversy ceases to exist or the parties lack a legally cognizable interest in the outcome. Allstate Ins. Co. v. Hallman, 159 S.W.3d 640, 642 (Tex. 2005). When a case becomes moot, the parties lose standing to maintain their claims. Williams v. Lara, 52 S.W.3d 171, 184 (Tex. 2001).

Argument

At the moment, the issue of whether the temporary injunction was proper is mooted by the sheer passage of time. Some of this may be Appellee's fault, but a good part of it also falls on Appellant's shoulders, for various reasons. With trial set just around the corner, there is no justiciable issue left concerning the continuation of the temporary injunction The case has become mooted through passage of time. The mootness doctrine prevents courts from rendering advisory opinions, and under article II, section 1 of the Texas Constitution, courts have no jurisdiction to issue advisory opinions. See Valley Baptist Med. Ctr. v. Gonzalez, 33 S.W.3d 821, 822 (Tex. 2000) (per curiam). "[A] controversy must exist between the parties at every stage of the legal proceedings, including the appeal." Bd. of Adjustment of City of San Antonio v. Wende, 92 S.W.3d 424, 427 (Tex. 2002) (quoting Williams v. Lara, 52 S.W.3d 171, 184 (Tex. 2001)). An issue may become moot when a party seeks a ruling on some matter which, when rendered, would not have any practical legal effect on a then-existing controversy. In re H&R Block Fin. Advisors, Inc., 262 S.W.3d at 900.

As a practical matter, the case is moot now. The court should therefore dismiss the appeal.

PRAYER FOR RELIEF

WHEREFORE, for these reasons, Appellee respectfully requests the court to affirm the trial court's issues of a temporary injunction and to deny appellant any and all relief requested, and in the alternative, dismiss the appeal as moot or as one requesting an illegal advisory opinion.

Respectfully submitted,

Philip T. Cowen
Law Office of Philip Cowen
500 E. Levee St.
Brownsville, Texas 78520
Tel. 956-541-1691
Fax 956-541-6872

By:/s/Philip T. Cowen
    Philip T. Cowen
    State Bar No. 24001933
    Attorney for Appellant

CERTIFICATE OF SERVICE

This is to certify that on July 9, 2015 a true and correct copy of the above and foregoing brief was served Appellant's Counsel via Idocs service of process to email st@taherzlaw.com.

/s/Philip T. Cowen
Philip T. Cowen

CERTIFICATE OF COMPLIANCE

Pursuant to Tex. R. App. P. 9.4, I hereby certify that this brief contains

7,913 words. This document was created using Word Perfect X4, using 14-point typeface for all

text, except for footnotes and long passages cited from cases, which are in 12- point typeface. In

making this certificate of compliance, The word count was determined using Word Perfect X4

software which has the capability to calculate a word count.

/s/Philip T. Cowen
Philip T. Cowen

# Appendix

Document                                                                      Page No.

A.     Deed of Trust CR542-565                                         1

B:     Portion of Transcript of Hearing on Temporary Injunction     25
CR602-624

C     Defendant Compass Bank's Amended Answer CRSupP86-89     48

D:     Texas Business and Commerce Code SUBCHAPTER B.     52
NEGOTIATION, TRANSFER, AND INDORSEMENT
Sec. 3.201 through 3.204.

E:     Texas Business and Commerce Code 3.302(2)©     54

F.     Note     55

G.     Transfer of Lien     56

H.     Modification and Extension Agreement     59

A. Deed of Trust CR542-565

(Showing no negotiation)

RIO GRANDE VALLEY ABSTRACT ~~
GF# 2020169611

After Recording Return To:

THE LAREDO NATIONAL BANK
P.O. BOX 59
LAREDO, TEXAS 78042-0059
RECORDS MANAGEMENT

_____ [Space Above This Line For Recording Data] _____

NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON,
YOU MAY REMOVE OR STRIKE ANY OF THE FOLLOWING INFORMATION
FROM THIS INSTRUMENT BEFORE IT IS FILED FOR RECORD IN THE PUBLIC
RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE
NUMBER.

# DEED OF TRUST

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined
in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this
document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated JANUARY 24, 2006, together
with all Riders to this document.
(B) "Borrower" is MYRNA ELIZABETH DE LUNA MORALES, a Feme Sole. Borrower
is the grantor under this Security Instrument.
(C) "Lender is THE LAREDO NATIONAL BANK. Lender is a National Banking
Association organized and existing under the laws of The United States of America
Lender's address is 600 SAN BERNARDO AVE., LAREDO, WEBB COUNTY, TEXAS
78040. Lender is the beneficiary under this Security Instrument.
(D) "Trustee" is JOSE C. GONZALEZ. Trustee's address is 600 SAN BERNARDO AVE.,
LAREDO, WEBB COUNTY, TEXAS 78040.
(E) "Note" means the promissory note signed by Borrower and dated JANUARY 24, 2006.
The Note states that Borrower owes Lender TWO HUNDRED NINETY-ONE THOUSAND
TWO HUNDRED AND NO/100THS DOLLARS (U.S. $291,200.00) plus interest. Borrower
has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later
than FEBRUARY 1, 2036.
(F) "Property" means the property that is described below under the heading "Transfer of
Rights in the Property."

1

L:\01 TRES\PACKAGES, 2006\ Morales, Myrna Elizabeth - $291,200.00

TEXAS—Single Family—Fannie Mae/Freddie Mac UNIFORM STATEMENT                Form 3044 1/01



(G) **"Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(H) **"Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☒ Second Home Rider |
| ☐ Balloon Rider | ☒ Planned Unit Development Rider | ☐ Other(s) [specify] |
| ☐ 1-4 Family Rider | ☐ Biweekly Payment Rider | |

(I) **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(J) **"Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(K) **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(L) **"Escrow Items"** means those items that are described in Section 3.

(M) **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(N) **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(O) **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(P) **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

2

L:\01 TRES\PACKAGES, 2006\ Morales, Myrna Elizabeth - $291,200.00
TEXAS—Single Family—Fannie Mae/Freddie Mac UNIFORM STATEMENT
Form 3044 1/01

Doc 00004874 Bk OR Vol 12199 Pg 143

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the **COUNTY** of **CAMERON, STATE OF TEXAS:**
[Type of Recording Jurisdiction]     [Name of Recording Jurisdiction]

**Lot Number Thirty-Five A (35A), Block Number Three (3), The Villas of South Padre, Town of South Padre Island, Cameron County, Texas, according to the map recorded in Cabinet I, Slot 1594-B and amended in Cabinet I, Slot 1697-A, Map Records of Cameron County, Texas**

which currently has the address of:

| 6503 FOUNTAIN WAY | SOUTH PADRE ISLAND | CAMERON | TEXAS | 78597 |
|---|---|---|---|---|
| [Street] | [City] | [County] | [State] | [Zip Code] |

("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the

3

L:\01 TRES\PACKAGES, 2006\ Morales, Myrna Elizabeth - $291,200.00

TEXAS—Single Family—Fannie Mae/Freddie Mac UNIFORM STATEMENT                    Form 3044 1/01

Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

    **2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3.  Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

    If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

    Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

    **3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall promptly furnish to Lender all notices of amounts to be paid under

4

L:\01 TRES\PACKAGES, 2006\ Morales, Myrna Elizabeth - $291,200.00
TEXAS—Single Family—Fannie Mae/Freddie Mac UNIFORM STATEMENT                    Form 3044 1/01

this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument,

5

L:\01 TRES\PACKAGES, 2006\ Morales, Myrna Elizabeth · $291,200.00

**TEXAS—Single Family—Fannie Mae/Freddie Mac UNIFORM STATEMENT**                    Form 3044 1/01

Doc 00004874 Bk OR 12199 Vol 146 Pg

leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject

6

L:\01 TRES\PACKAGES, 2006\ Morales, Myrna Elizabeth - $291,200.00
TEXAS—Single Family—Fannie Mae/Freddie Mac UNIFORM STATEMENT                    Form 3044 1/01

Doc 00004874 BK OR 12199 Vol 147 Pg

to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit

7

L:\01 TRES\PACKAGES, 2006\ Morales, Myrna Elizabeth - $291,200.00

TEXAS—Single Family—Fannie Mac/Freddie Mac UNIFORM STATEMENT                    Form 3044 1/01

Doc 000004874 Bk OR 12199 Vol 148 Pg

waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate

L:\01 TRES\PACKAGES, 2006\ Morales, Myrna Elizabeth - $291,200.00
TEXAS—Single Family—Fannie Mae/Freddie Mac UNIFORM STATEMENT                    Form 3044 1/01

Doc 00004874 Bk OR 12199 Vol 149 Pg

549

from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's

9

L:\01 TRES\PACKAGES, 2006\ Morales, Myrna Elizabeth - $291,200.00

TEXAS—Single Family—Fannie Mae/Freddie Mac UNIFORM STATEMENT

Form 3044 1/01

Doc 00004874 Bk OR Vol 12199 Pg 150

risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) **Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

(b) **Any such agreements will not affect the rights Borrower has — if any — with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking,

Doc 00004874 Bk OR 12199 Vol 151 Pg

10

L:\01 TRES\PACKAGES, 2006\ Morales, Myrna Elizabeth - $291,200.00
TEXAS—Single Family—Fannie Mae/Freddie Mac UNIFORM STATEMENT          Form 3044 1/01

destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by

11

L:\01 TRES\PACKAGES, 2006\ Morales, Myrna Elizabeth - $291,200.00

TEXAS—Single Family—Fannie Mae/Freddie Mac UNIFORM STATEMENT                    Form 3044 1/01

Doc 00004874  Bk OR 12199  Vol 152  Pg

Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the

12

L:\01 TRES\PACKAGES, 2006\ Morales, Myrna Elizabeth - $291,200.00
TEXAS—Single Family—Fannie Mac/Freddie Mac UNIFORM STATEMENT                    Form 3044 1/01

Doc 000004874 BK OR 12199 Vol 153 Pg

parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision. As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

   **17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

   **18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

   If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

   If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

   **19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are

13

L:\01 TRES\PACKAGES, 2006\ Morales, Myrna Elizabeth - $291,200.00

TEXAS—Single Family—Fannie Mae/Freddie Mac UNIFORM STATEMENT                    Form 3044 1/01

Doc 00004874 OR Bk 12199 Vol 154 Pg

insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in

14

L:\01 TRES\PACKAGES, 2006\ Morales, Myrna Elizabeth - $291,200.00
TEXAS—Single Family—Fannie Mae/Freddie Mac UNIFORM STATEMENT                     Form 3044 1/01

violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice will result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence. For the purposes of this Section 22, the term "Lender" includes any holder of the Note who is entitled to receive payments under the Note.**

**If Lender invokes the power of sale, Lender or Trustee shall give notice of the time, place and terms of sale by posting and filing the notice at least 21 days prior to sale as provided by Applicable Law. Lender shall mail a copy of the notice to Borrower in the manner prescribed by Applicable Law. Sale shall be made at public venue. The sale must begin at the time stated in the notice of sale or not later than three hours after that time and between the hours of 10 a.m. and 4 p.m. on the first Tuesday of the month. Borrower authorizes Trustee to sell the Property to the highest bidder for cash in one or more parcels**

15

L:\01 TRES\PACKAGES, 2006\ Morales, Myrna Elizabeth - $291,200.00

**TEXAS—Single Family—Fannie Mae/Freddie Mac UNIFORM STATEMENT**                    Form 3044 1/01

Doc 00004874 BK OR 12199 Vol 156 Pg

and in any order Trustee determines. Lender or its designee may purchase the Property at any sale. Trustee shall deliver to the purchaser Trustee's deed conveying indefeasible title to the Property with covenants of general warranty from Borrower. Borrower covenants and agrees to defend generally the purchaser's title to the Property against all claims and demands. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

If the Property is sold pursuant to this Section 22, Borrower or any person holding possession of the Property through Borrower shall immediately surrender possession of the Property to the purchaser at that sale. If possession is not surrendered, Borrower or such person shall be a tenant at sufferance and may be removed by writ of possession or other court proceeding.

23. **Release.** Upon payment of all sums secured by this Security Instrument, Lender shall provide a release of this Security Instrument to Borrower or Borrower's designated agent in accordance with Applicable Law. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. **Substitute Trustee; Trustee Liability.** All rights, remedies and duties of Trustee under this Security Instrument may be exercised or performed by one or more trustees acting alone or together. Lender, at its option and with or without cause, may from time to time, by power of attorney or otherwise, remove or substitute any trustee, add one or more trustees, or appoint a successor trustee to any Trustee without the necessity of any formality other than a designation by Lender in writing. Without any further act or conveyance of the Property the substitute, additional or successor trustee shall become vested with the title, rights, remedies, powers and duties conferred upon Trustee herein and by Applicable Law.

Trustee shall not be liable if acting upon any notice, request, consent, demand, statement or other document believed by Trustee to be correct. Trustee shall not be liable for any act or omission unless such act or omission is willful.

25. **Subrogation.** Any of the proceeds of the Note used to take up outstanding liens against all or any part of the Property have been advanced by Lender at Borrower's request and upon Borrower's representation that such amounts are due and are secured by valid liens against the Property. Lender shall be subrogated to any and all rights, superior titles, liens and equities owned or claimed by any owner or holder of any outstanding liens and debts, regardless of whether said liens or debts are acquired by Lender by assignment or are released by the holder thereof upon payment.

26. **Partial Invalidity.** In the event any portion of the sums intended to be secured by this Security Instrument cannot be lawfully secured hereby, payments in reduction of such sums shall be applied first to those portions not secured hereby.

27. **Purchase Money; Owelty of Partition; Renewal and Extension of Liens Against Homestead Property; Acknowledgment of Cash Advanced Against Non-Homestead Property.**

16

L:\01 TRES\PACKAGES, 2006\ Morales, Myrna Elizabeth - $291,200.00
TEXAS—Single Family—Fannie Mae/Freddie Mac UNIFORM STATEMENT

Form 3044 1/01

Doc 00004874 BK OR 12199 Vol 157 Pg

**Check box as applicable:**

☐ **Purchase Money.**

The funds advanced to Borrower under the Note were used to pay all or part of the purchase price of the Property. The Note also is primarily secured by the vendor's lien retained in the deed of even date with this Security Instrument conveying the Property to Borrower, which vendor's lien has been assigned to Lender, this Security Instrument being additional security for such vendor's lien.

☐ **Owelty of Partition.**

The Note represents funds advanced by Lender at the special instance and request of Borrower for the purpose of acquiring the entire fee simple title to the Property and the existence of an owelty of partition imposed against the entirety of the Property by a court order or by a written agreement of the parties to the partition to secure the payment of the Note is expressly acknowledged, confessed and granted.

☒ **Renewal and Extension of Liens Against Homestead Property.**

The Note is in renewal and extension, but not in extinguishment, of the indebtedness described on the attached Renewal and Extension Exhibit which is incorporated by reference. Lender is expressly subrogated to all rights, liens and remedies securing the original holder of a note evidencing Borrower's indebtedness and the original liens securing the indebtedness are renewed and extended to the date of maturity of the Note in renewal and extension of the indebtedness.

☐ **Acknowledgment of Cash Advanced Against Non-Homestead Property.**

The Note represents funds advanced to Borrower on this day at Borrower's request and Borrower acknowledges receipt of such funds. Borrower states that Borrower does not now and does not intend ever to reside on, use in any manner, or claim the Property secured by this Security Instrument as a business or residential homestead. Borrower disclaims all homestead rights, interests and exemptions related to the Property.

**28. Loan Not a Home Equity Loan. The Loan evidenced by the Note is not an extension of credit as defined by Section 50(a)(6) or Section 50(a)(7), Article XVI, of the Texas Constitution. If the Property is used as Borrower's residence, then Borrower agrees that Borrower will receive no cash from the Loan evidenced by the Note and that any advances not necessary to purchase the Property, extinguish an owelty lien, complete construction, or renew and extend a prior lien against the Property, will be used to reduce the balance evidenced by the Note or such Loan will be modified to evidence the correct Loan balance, at Lender's option. Borrower agrees to execute any documentation necessary to comply with this Section 28.**

17

L:\01 TRES\PACKAGES, 2006\ Morales, Myrna Elizabeth - $291,200.00

TEXAS—Single Family—Fannie Mae/Freddie Mac UNIFORM STATEMENT                    Form 3044 1/01

Doc 0000048974 Bk OR Vol 12199 Pg 158

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____

_____ (Seal)
MYRNA ELIZABETH DE LUNA
MORALES
                                                    - Borrower

Witnesses:

_____

_____ [Space Below This Line For Acknowledgment]_____

**STATE OF TEXAS**             §
                               §
**COUNTY OF CAMERON**          §

This instrument was acknowledged before me on this 25th day of _____, 2006 by **MYRNA ELIZABETH DE LUNA MORALES.**

MARTHA L. CAMACHO
Notary Public
State of Texas
Comm Exp. 07-14-2009

_____
**NOTARY PUBLIC, STATE OF TEXAS**

18

L:\01 TRES\PACKAGES, 2006\ Morales, Myrna Elizabeth - $291,200.00
**TEXAS—Single Family—Fannie Mae/Freddie Mac UNIFORM STATEMENT**                      Form 3044 1/01

Doc 000004874 OR Vol 12199 Pg 159

# SECOND HOME RIDER

THIS SECOND HOME RIDER is made this <u>24th</u> day of **January, 2006**, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower," whether there are one or more persons undersigned) to secure Borrower's Note to **THE LAREDO NATIONAL BANK** (the "Lender") of the same date and covering the Property described in the Security Instrument (the "Property"), which is located at:

**6503 FOUNTAIN WAY, SOUTH PADRE ISLAND, CAMERON COUNTY, TEXAS 78597**
[Property Address]

In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree that Sections 6 and 8 of the Security Instrument are deleted and are replaced by the following:

**6. Occupancy.** Borrower shall occupy, and shall only use, the Property as Borrower's second home. Borrower shall keep the Property available for Borrower's exclusive use and enjoyment at all times, and shall not subject the Property to any timesharing or other shared ownership arrangement or to any rental pool or agreement that requires Borrower either to rent the Property or give a management firm or any other person any control over the occupancy or use of the Property.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's second home.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this Second Home Rider.

...................................................................... (Seal)
MYRNA ELIZABETH DE LUNA MORALES
                   -Borrower

**STATE OF TEXAS** §
§
**COUNTY OF CAMERON** §

This instrument was acknowledged before me on this ___ day of
_____, 2006 by MYRNA ELIZABETH DE LUNA MORALES.

MARTHA L. CAMACHO
Notary Public
State of Texas
Comm Exp. 07-14-2009

NOTARY PUBLIC, STATE OF TEXAS

MULTISTATE SECOND HOME RIDER–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT      Form 3890 1/01
L:\01 TRES\PACKAGES, 2006 \ Morales, Myrna Elizabeth -$291,200.00

Doc 00004874 Bk OR 12199 Vol 160 Pg

# PLANNED UNIT DEVELOPMENT RIDER

THIS PLANNED UNIT DEVELOPMENT RIDER is made this 24th day of January, 2006, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date, given by the undersigned (the "Borrower") to secure Borrower's Note to THE LAREDO NATIONAL BANK, (the "Lender") of the same date and covering the Property described in the Security Instrument and located at:

**6503 FOUNTAIN WAY, SOUTH PADRE ISLAND, CAMERON COUNTY, TEXAS 78597**
[Property Address]

The Property includes, but is not limited to, a parcel of land improved with a dwelling, together with other such parcels and certain common areas and facilities, as described in **Volume 5454, Page 9, Official Public Records of Cameron County, Texas; First Amendment recorded in Volume 5597, Page 162, Official Records of Cameron County, Texas; (the "Declaration").** The Property is a part of a planned unit development known as

**THE VILLAS OF SOUTH PADRE**
[Name of Planned Unit Development]

(the "PUD"). The Property also includes Borrower's interest in the homeowners association or equivalent entity owning or managing the common areas and facilities of the PUD (the "Owners Association") and the uses, benefits and proceeds of Borrower's interest.

**PUD COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. PUD Obligations.** Borrower shall perform all of Borrower's obligations under the PUD's Constituent Documents. The "Constituent Documents" are the (i) Declaration; (ii) articles of incorporation, trust instrument or any equivalent document which creates the Owners Association; and (iii) any by-laws or other rules or regulations of the Owners Association. Borrower shall promptly pay, when due, all dues and assessments imposed pursuant to the Constituent Documents.

**B. Property Insurance.** So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy insuring the Property which is satisfactory to Lender and which provides insurance coverage in the amounts (including deductible levels), for the periods, and against loss by fire, hazards included within the term "extended coverage," and any other hazards, including, but not limited to, earthquakes and floods, for which Lender requires insurance, then: (i) Lender waives the provision in Section 3 for the Periodic Payment to Lender of the yearly premium installments for property insurance on the Property; and (ii) Borrower's obligation under Section 5 to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

What Lender requires as a condition of this waiver can change during the term of the loan.

Borrower shall give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, or to common areas and facilities of the PUD, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender. Lender shall apply the proceeds to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

**C. Public Liability Insurance.** Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

**D. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property or the common areas and facilities of the PUD, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the

L:\01 TRES\PACKAGES, 2006 \ Morales, Myrna Elizabeth -$291,200.00     1

MULTISTATE PUD RIDER--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                Form 3150 1/01

Doc 00004874 Bk OR Vol 12199 Pg 161

Security Instrument as provided in Section 11.

E. **Lender's Prior Consent.** Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: **(i)** the abandonment or termination of the PUD, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; **(ii)** any amendment to any provision of the "Constituent Documents" if the provision is for the express benefit of Lender; **(iii)** termination of professional management and assumption of self-management of the Owners Association; or **(iv)** any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

F. **Remedies.** If Borrower does not pay PUD dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this PUD Rider.

 _____(Seal)
MYRNA ELIZABETH DE LUNA MORALES
-Borrower

STATE OF TEXAS          §
                        §
COUNTY OF CAMERON       §

This instrument was acknowledged before me on this ⟨25⟩ day of ⟨January⟩_____, 2006 by MYRNA ELIZABETH DE LUNA MORALES.

MARTHA L. CAMACHO
Notary Public
State of Texas
Comm Exp. 07-14-2009

_____
NOTARY PUBLIC, STATE OF TEXAS

L:\01 TRES\PACKAGES, 2006\ Morales, Myrna Elizabeth -$291,200.00    2

MULTISTATE PUD RIDER--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3150 1/01

Doc 00004874 OR Bk 12199 Vol 162 Pg

21

562

**RENEWAL AND EXTENSION EXHIBIT**
(Deed of Trust)

BORROWER:    **MYRNA ELIZABETH DE LUNA MORALES, a Feme Sole**

TRUSTEE:    **JOSE C. GONZALEZ**

PROPERTY DESCRIPTION:

Lot Number Thirty-Five A (35A), Block Number Three (3), The Villas of South Padre, Town of South Padre Island, Cameron County, Texas, according to the map recorded in Cabinet I, Slot 1594-B and amended in Cabinet I, Slot 1697-A, Map Records of Cameron County, Texas

    To the extent of $280,786.75, the Note hereby secured is given in renewal and extension of the unpaid balance of note in the original principal sum of $300,700.00 dated September 30, 2002, executed by MYRNA ELIZABETH DE LUNA MORALES and payable to the order of UNION PLANTERS BANK, N.A.; additionally secured by a Deed of Trust of even date therewith to GEORGE M. SHANKS, JR., Trustee for UNION PLANTERS BANK, N.A., executed by MYRNA ELIZABETH DE LUNA MORALES, filed for record under Volume 8390, Page 45 of the Official Public Records of Cameron County, Texas; which said note and lien were assigned and/or transferred to THE LAREDO NATIONAL BANK and which lien is hereby expressly acknowledged by Grantors as a valid and subsisting lien against the property herein described, and it is expressly agreed that said lien is hereby renewed, extended and continued in full force and effect to secure the payment of the Note hereby secured. Balance being renewed: $280,786.75

    To the extent of TEN THOUSAND FOUR HUNDRED THIRTEEN AND 25/100THS DOLLARS ($10,413.25), the Note hereby secured represents funds advanced as reasonable costs necessary to refinance the indebtedness hereby being refinanced.

    EXECUTED this 25 day of January, 2006

_MYRNA E de Luna M._
_____
MYRNA ELIZABETH DE LUNA MORALES

1

REV 2/01

RENEWAL AND EXTENSION EXHIBIT
(Deed of Trust Lien)

L:\01 \PACKAGES CWGMCD, 2006 \ Morales, Myrna Elizabeth -$291,200.00

Doc 00004874 Bk OR 12199 Vol 163 Pg

22

563

STATE OF TEXAS    §
                  §
COUNTY OF CAMERON §

This instrument was acknowledged before me on this 25 day of January, 2006 by **MYRNA ELIZABETH DE LUNA MORALES.**

_____
NOTARY PUBLIC, STATE OF TEXAS

MARTHA L. CAMACHO
Notary Public
State of Texas
Comm Exp. 07-14-2009

2

RENEWAL AND EXTENSION EXHIBIT
(Deed of Trust Lien)

L:\01 \PACKAGES CWGMCD, 2006\ Morales, Myrna Elizabeth -$291,200.00

Doc 00004874 Bk OR 12189 Pg 164 REV 01

23

564

Doc
0000004874   Bk   Vol   Pg
             DR   12199   165

FILED AND RECORDED
OFFICIAL PUBLIC RECORDS
On: Jan 26,2005   at   04:27P

Document Number:        00004874

                   By
Part Time
Joe G Rivera, County Clerk
Cameron County



565

B.        Portion of Transcript of Hearing on Temporary Injunction CR602-624

RECEIVED
2014-DCL-02962
8/1/2014 5:25:22 PM
Aurora De La Garza
Cameron County District Clerk
By Cesar Rodriguez Deputy Clerk

1

# REPORTER'S RECORD

## TRIAL COURT CAUSE NO. 2014-DCL-2962-A

- - - - - - - - - - - - - - x
                 :

MYRNA ELIZABETH DE LUNA     :    IN THE DISTRICT COURT
MORALES
                 :

VS                       :    107TH JUDICIAL DISTRICT
                 :

LAREDO NATIONAL BANK, D/B/A  :
AS BBVA COMPASS BANK        :    CAMERON COUNTY, TEXAS
                 :

- - - - - - - - - - - - - - x

## TEMPORARY INJUNCTION

On the 26th day of June, 2014, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Benjamin Euresti, Jr., Judge Presiding, held in Brownsville, Cameron County, Texas.

Proceedings reported by computerized stenotype machine.

PAM. L. ESQUIVEL, CSR, RMR, CRR



# APPEARANCES

**APPEARING FOR THE PLAINTIFF:**

HON. NOE ROBLES
State Bar No. 17118250
Attorney at Law
23331 Tamm Lane
Harlingen, Texas 78552
(956) 440-8200

**APPEARING FOR THE DEFENDANT:**

HON. SELIM H. TAHERZADEH
State Bar No. 24046944
Taherzadeh, P.L.L.C.
5080 Spectrum Drive, Suite 1000 East
Addison, Texas 75001
(469) 791-0445
(469) 828-2772 Fax

INDEX

**JUNE 26, 2014**                                          **PAGE**   **VOL**

Case called                                                    3        1

Announcements                                                  3        1

Court's ruling on jurisdiction                                 3        1

**PLAINTIFF'S WITNESSES:**

| NAME | DX | CX | RDX | RCX | VDX | VOL |
|------|----|----|-----|-----|-----|-----|
| Myrna Morales | 4 | 22 | 36 | 37 |  | 1 |

|  |  | PAGE | VOL |
|--|--|------|-----|
| Both sides rest and close |  | 38 | 1 |
| Closing statements by Mr. Robles |  | 38 | 1 |
| Closing statements by Mr. Taherzadeh |  | 43 | 1 |
| Court's ruling |  | 56 | 1 |
| Adjourn |  | 57 | 1 |
| Certificate of Court Reporter |  | 58 | 1 |

PAM L. ESQUIVEL, CSR, RMR, CRR

604

27

## INDEX OF EXHIBITS

**PLAINTIFF'S EXHIBITS:**

| NO. | DESCRIPTION | OFFERED | RECEIVED | VOL |
|-----|-------------|---------|----------|-----|
| 1 | Deed of trust | 18 | 18 | 1 |
| 2 | Notice of default and intent to accelerate dated January 8, 2014 | 7 | 7 | 1 |
| 3 | Notice of acceleration and trustee's sale dated February 10, 2014 | 7 | 7 | 1 |
| 4 | Notice of acceleration and trustee's sale dated February 27, 2014 | 7 | 7 | 1 |
| 5 | Two e-mails dated March 31, 2014, and April 14, 2014 | 10 | 11 | 1 |
| 6 | Two e-mails dated March 20, 2014, and March 28, 2014 | 10 | 11 | 1 |
| 7 | One to four family residential contract dated March 2014 | 13 | 13 | 1 |
| 8 | One to four family residential contract dated April 14, 2014 | 14 | 15 | 1 |
| 9 | One to four family residential contract dated June 4, 2014 | 16 | 16 | 1 |

# P R O C E E D I N G S

THE COURT: All right. You may be seated. This is Cause Number 14-DCL-2962, Myrna De Luna Morales and Laredo National Bank. Are you all ready to proceed?

MR. ROBLES: Plaintiff is ready, Judge.

MR. TAHERZADEH: We're ready, Your Honor.

THE COURT: Okay. Mr. Robles?

MR. ROBLES: Yes. I'd like to call Myrna Morales.

THE COURT: Okay.

MR. TAHERZADEH: Your Honor, before we begin with the testimony, at the last hearing I think you had asked us to brief the issue about the Court's jurisdiction. You said you were going to make a ruling on it. I didn't know if you had actually issued a ruling on it yet.

THE COURT: For the record, the Court does find jurisdiction based on the briefs and the pleadings submitted.

MR. TAHERZADEH: Okay. So -- okay. Thank you, Your Honor.

THE COURT: Okay. You may proceed.

**MYRNA MORALES,**

**testified through a certified interpreter as follows:**

**DIRECT EXAMINATION**

**BY MR. ROBLES:**

Q. Would you state your name?

A. My name is Myrna Elizabeth De Luna Morales.

Q. Ms. Morales, do you -- did you buy a home on -- at South Padre Island back sometime in 2006?

A. Yes.

Q. Was that more or less correct, about 2006, or was it before?

A. The exact date I don't have.

Q. Okay. And how much did you originally agree to pay for the house?

A. Monthly speaking?

Q. No, no. How much was the sale price when you bought it and financed it?

A. $425,000.

Q. Okay. And you borrowed some money, and you went into a loan and a note with Laredo National Bank?

A. Yes.

Q. And ever since then, since that time you've been making monthly payments to Laredo National Bank until recently; is that correct?

A. Exactly.

Q.    You need to speak up.

A.    Okay.  Exactly.

Q.    And there have been times, in fact there have been many times when you got behind and late payments and interest on the note; is that true?

A.    Yes.

Q.    And those times that you've been behind, have you been communicating with the bank and have they agreed to give you extensions and renewals on the note payments?

A.    Yes.

Q.    And that's happened on more than one occasion. How many, more or less?

A.    Like around three times.  Three times.

Q.    Okay.  And during those times, did they ever file a notice to foreclose on your property?

A.    No.

Q.    They've always given you -- they've always agreed to give you extensions to pay?

A.    Exactly.  Yes.

Q.    And they've accepted your late payments before?

A.    Yes.

Q.    Okay.  This time this past year that you got behind on the mortgage payments, can you just tell the Court just briefly why?  What happened with you, your income?

A.   Well, you know, I am a Mexican.  And my business right now due to the situation in Mexico, it's very complicated.  So I lost my business after 17 years.  And I've been paying a lot of money for many years towards this house.

Q.   Okay.  Let me stop you there.

A.   Okay.

Q.   And when you became delinquent in 2013, you began receiving papers from the bank about the bank foreclosing on your property; is that right?

A.   Yes.

Q.   And you went to see a lawyer by the name of Frank Wood here in Brownsville, Texas?

A.   Yes.

Q.   And did he assist you before I represented you in trying to stop this foreclosure?

A.   Yes.

Q.   Okay.  And you --

MR. ROBLES:  May I approach the witness, Judge?

THE COURT:  You may.

Q.   (BY MR. ROBLES)  I'll show you Plaintiff's Exhibits No. 2, No. -- I don't think there's a No. 3, right?  I'll show you Plaintiff's Exhibits No. 2, 3, and 4.  Are these some of the letters you received from the

bank?

MR. TAHERZADEH: Your Honor, may I -- may I see copies of the exhibits?

THE COURT: Well, when he offers them.

MR. ROBLES: I haven't offered them yet.

THE COURT: You may. Let him lay the predicate first.

MR. ROBLES: I'm sorry?

THE COURT: I said go ahead and lay the predicate.

MR. ROBLES: I just asked her are these the letters she received from the bank, 2, 3, and 4.

THE WITNESS: Yes.

MR. TAHERZADEH: No objection.

THE COURT: You're offering them?

MR. ROBLES: Yes, Judge, I'm offering 2, 3, and 4.

THE COURT: Okay. They'll be admitted.

**(Plaintiff's Exhibit No. 2, 3, and 4 admitted)**

Q. (BY MR. ROBLES) Now, Plaintiff's Exhibit No. 2 is dated January the 8th, 2014, correct?

A. Correct.

Q. Okay. Now, just for the record, can you read this English and understand it?

A. Not all.

Q. Well, how much can you read and how much can you understand?

A. Like around 70 percent.

Q. Okay. Now, the Plaintiff's Exhibit 2 is entitled "notice of default and intent to accelerate." Okay. Does -- if you can read it and understand it, tell the Court if there is a date that's specified that says on this day and giving the day and the month and the day and the year, you have until this day to cure the default. Is there such a date specified in this document if you can tell us? I'm asking you for a certain date.

A. Exactly. No, there's no specific date here.

Q. Okay. And does this document entitled "notice of default and intent to accelerate" specify the balance owed on the mortgage?

A. It doesn't specify it.

MR. ROBLES: I tender to the Court Plaintiff's No. 2.

Q. (BY MR. ROBLES) Now I'll show you Plaintiff's Exhibit No. 3, which is entitled "notice of acceleration and trustee's sale." Did you -- can you tell us if on this document there is a date specified by the bank that you have to cure the default and stop the acceleration of the note?

A.   No.

Q.   Is there an amount shown on this document, Plaintiff's Exhibit 3, as to what the amount is owed to the bank at that point in time?

A.   No, neither.

MR. ROBLES:   I tender Plaintiff's Exhibit 3, Your Honor.

Q.   (BY MR. ROBLES)   Now, Plaintiff's Exhibit 4 is entitled "notice of acceleration and trustee's sale," and this is dated February 27th of 2014.

A.   Yes.

Q.   Is this the last document that you received before they foreclosed?

A.   (In English)   Yes.

Q.   Yes?

A.   (In English)   Yes.

Q.   Now, on this document, this is the notice that you were given just before the foreclosure took place on April 1, 2014, right?

A.   Correct.

Q.   Now, does this document indicate a specified date that you have to cure the default or the amount required to cure the default?

A.   No.   No, none of them.

MR. ROBLES:   I tender Plaintiff's

Exhibit 4, Your Honor.

Q. (BY MR. ROBLES) Now, when you were dealing with -- when your lawyer, Frank Wood, was talking and dealing with the bank, do you know who he was dealing with?

A. The specific name, I don't know.

Q. Okay. Do you know who Selim Taherzadeh is?

A. Well, he's the one that signs the document, but that's it.

Q. Did you know who he was?

A. No.

Q. Okay.

MR. ROBLES: I'm going to tender these to opposing counsel, Judge. They're e-mails between Frank Wood and Selim, the attorney here. And I'll -- if he needs to introduce any e-mails, I will have no objection.

MR. TAHERZADEH: No objection.

MR. ROBLES: Thank you.

THE COURT: Okay. What exhibits?

MR. ROBLES: Five and 6, they're e-mails between the parties, Judge.

THE COURT: You're offering those?

MR. ROBLES: Yes, offering 5 and 6. No objection.

THE COURT: They'll be admitted.

**(Plaintiff's Exhibit No. 5 and 6 admitted)**

Q.    (BY MR. ROBLES)  Ms. Morales, you have had at least maybe I would say either two, three contracts to sell the property; is that correct?

A.    Correct.

Q.    I'll show you Plaintiff's Exhibit 7 and ask you if that's the first contract.

A.    Okay.  (In English)  Yes.

Q.    Yes or no?

A.    (In English)  Yes.

Q.    Okay.  I need to let him interpret because I want to make sure we get it right, okay?

A.    Okay.

Q.    Why did you enter into a contract to sell your property at that time on the first contract?

A.    Well, we had the time to sell it and the bank -- well, we had to sell it and we had that client.

Q.    Okay.  And why were you trying to sell your house?

A.    Because I don't have the money to keep on paying it.

Q.    And were you selling the house to pay off the bank?

A.    Exactly.

Q.    Okay.  During the time that your lawyer,

Mr. Wood, was dealing with the bank and you were talking to your lawyer, Mr. Wood, and through the e-mails that your lawyer got from the bank lawyer, did you ever see what the amount that was owed -- the full amount owed on the principal, did they ever give you that amount?

A. No.

Q. Did they ever tell you how much you needed just to cure the default, just to pay off what the -- the arrears and the interest?

A. No.

Q. Now, I'm asking you just before, the month before they foreclosed on the property on April 1st, did you ever get those figures from the bank?

A. No.

Q. Okay. Now, when you entered into this first contract, Plaintiff's Exhibit No. 7, from the sale of the home, were you going to have enough money to pay off the home, at least to your knowledge what was owed on it?

A. Yes.

Q. And was this contract given to the bank prior to April 1st of 2014?

MR. ROBLES: Did you finish interpreting?

THE INTERPRETER: Yes.

Q. (BY MR. ROBLES) Did you or your lawyer advise them that this -- this closing taking place on the sale,

that you would have been able to have enough money, in your mind, to pay off what was owed?

A. Okay. Ask me the question again, please.

Q. Okay. If this sale had occurred and you would have sold the house on this contract, would you have had the money to pay off the money that was owed to the bank on the house, the entire principal and interest?

A. Yes. The contract, that's what it talks about. It talks about the value of the house to be able to make the payment.

Q. Now, did this contract ever close on the sale? Did you ever sell it?

A. Well, he had second thoughts.

Q. And why do you know he had second thoughts?

A. Well, the problems that were going on with the bank, they needed more time, et cetera. So he got -- kind of got frustrated with that.

Q. And they decided to cancel the contract?

A. (In English) Yes.

Q. Okay.

MR. ROBLES: I offer Plaintiff's Exhibit No. 7.

MR. TAHERZADEH: No objection.

THE COURT: It'll be admitted.

**(Plaintiff's Exhibit No. 7 admitted)**

Q. (BY MR. ROBLES) Now, after that first contract, there was a second one; is that correct?

A. (In English) Yes.

Q. From a buyer named as Joseph Petrauskas and Yanira Petrauskas.

A. Yes.

Q. Is that correct?

A. Correct.

Q. And this contract was submitted to the bank before the sale of April 1st of 2014; is that correct?

A. Yes.

Q. April 1, 2014. Before that date you had submitted this contract to the bank?

A. Yes.

Q. And what happened? Did the bank accept it or not?

A. Talking to Mr. Wood, he told me that at the last moment the bank had said that they don't accept any more contracts.

MR. ROBLES: I offer Plaintiff's Exhibit No. 8, Judge.

MR. TAHERZADEH: Just to make sure we're talking about the correct one, this is the one where the seller is Compass Bank? Do we have the right contract?

MR. ROBLES: Oh, yeah. It was made out to

Compass Bank, yeah, but the buyers are the same.

MR. TAHERZADEH: So we're not talking about a contract in which Ms. Morales was offering to sell?

MR. ROBLES: The offer -- that's correct, Judge. The offer was for the bank to sell it to these people, but it could have been the other way. I can ask her that if you want.

MR. TAHERZADEH: I just -- I think we probably need to clarify it.

MR. ROBLES: I'll clarify it.

Q. (BY MR. ROBLES) Okay. Ms. Morales, this contract was made out between Compass Bank and the buyers, the Petrauskas?

A. Correct.

Q. And that was done by the real estate agent; is that correct?

A. Correct.

Q. Okay. And, of course, that was refused by the bank?

A. Yes.

MR. TAHERZADEH: No objection, Your Honor.

THE COURT: Okay. Eight will be admitted.

**(Plaintiff's Exhibit No. 8 admitted)**

Q. (BY MR. ROBLES) And then Plaintiff's Exhibit No. 9 is another contract, the most recent one. I believe

that this is still a current contract; is that correct?

A. Yes.

Q. And it is also made out as the seller being Compass Bank and Joseph Petrauskas and Yanira Petrauskas; is that right?

A. Correct.

Q. And was that made as an offer to the bank because the bank had already foreclosed on the property and gotten title?

A. Correct.

MR. TAHERZADEH: Do you happen to know what the date of the last exhibit was?

MR. ROBLES: No, but it was -- I think it was March 26th.

MR. TAHERZADEH: What exhibit number is that one more time? Sorry.

MR. ROBLES: No. 9.

MR. TAHERZADEH: No objection.

MR. ROBLES: I'll offer Exhibit No. 9.

THE COURT: Hold on.

MR. TAHERZADEH: No objection.

THE COURT: Okay. Nine will be admitted.

**(Plaintiff's Exhibit No. 9 admitted)**

Q. (BY MR. ROBLES) This last contract that was submitted, that was for cash deal on the house; is that

correct?

A. Correct.

Q. And now to your knowledge, would the amount shown as the sales price of $303,200, should that have covered the entire amount of the principal and interest owed on the mortgage?

A. Correct.

Q. Now, again, that contract was not accepted by the bank either; is that correct?

A. Exactly.

Q. Okay. Now, you signed a -- when you made the original note with the bank, you signed this deed of trust along with the bank that was back then Laredo National Bank. It's now Compass Bank.

A. With Laredo National Bank.

Q. Originally it was Laredo National Bank.

A. Correct.

Q. And Compass Bank has since bought -- purchased the mortgage; do you understand that?

A. Correct.

MR. ROBLES: This has already been admitted, but I'll --

MR. TAHERZADEH: I think procedurally, I don't think it was actually ever admitted. I think it was pending admission.

MR. ROBLES: It was -- I'll offer it. It was admitted at the beginning I'm pretty sure.

THE COURT: The deed of trust?

MR. ROBLES: Yeah.

MR. TAHERZADEH: I thought it was pending because we were dealing with the jurisdiction issue first and we were going to get back to it. I don't think I object to it. I just wanted to take it up and make sure it's a clean copy.

THE COURT: Okay.

MR. TAHERZADEH: I doubt I'll have an objection.

THE COURT: Okay.

MR. TAHERZADEH: No objection.

THE COURT: All right. If it hasn't been admitted, I'll admit it at this time.

**(Plaintiff's Exhibit No. 1 admitted)**

Q. (BY MR. ROBLES) Now, you made every effort to satisfy the payment on this mortgage, even employing Mr. Wood to assist you, did you not?

A. The impossible was done. Everything, we tried to do everything until that day where Mr. Wood said, "Do you know what? They don't accept any more contracts."

Q. Okay. I think I already asked you this, but I want to make sure. During any of the deals that you and

Mr. Wood had with the attorney for the bank, did they ever specify in any of the e-mails or letters exactly how much was the arrears and interest to pay, that was required to pay prior to April 1st of 2014?

A. No.

Q. Prior to April 1, 2014, did they specify to you, did the bank specify to you or your lawyer exactly how much was owed on the mortgage, the principal and interest at that time?

A. No.

Q. As a result of the bank refusing to accept your -- the money from the sale of the home, you lost those contracts to sell the house; is that correct?

A. Correct.

Q. Now, I believe -- tell the Judge if I'm wrong. Mr. Petrauskas and his wife, are they still currently holding cash to buy the house at this time?

A. Yes.

Q. And now just today you told me that there's another buyer coming in Saturday with cash on hand and likes the house and may also purchase that house?

A. Correct.

Q. Now, if you sell the house to these purchasers and pay off the bank, you're going to be able to recuperate most of your losses, monetary losses; is that

correct?

A. Well, a part of my losses.

Q. Okay. And now, the house where you're presently living at the Island, this -- it's still furnished --

THE INTERPRETER: What?

Q. (BY MR. ROBLES) The house at the Island, the house we're talking about you're living in, it is fully furnished; is that correct?

A. Correct.

Q. And about how much money worth of furnishings is there presently at the house at today's current market value?

A. Maybe around -- like around 27,000. No. I'm sorry. 2,000 -- no, no. Excuse me. I'm sorry. I'm kind of confused right now.

Q. You said 27,000.

A. 27,000.

Q. Okay. It's a three-bedroom home?

A. Yes.

Q. Large living room, kitchen area?

A. Everything. Yes.

Q. And now, if -- if the foreclosure stands as it is and you lose completely to the bank, are there damages and losses that you will never be able to recuperate?

A. Many, a lot, many years of making payments.

Q. Now, this also has -- has it brought a lot of stress and emotional feelings for you that you've suffered?

A. Well, me and my dad because we're -- we've been the ones that have been paying for it.

Q. Okay. Now, are you asking the Court to continue the temporary injunction so that you can maintain possession of the home?

A. So that can continue so the house can be sold?

Q. No. Simple question: Are you asking the Judge here to stop the bank from evicting you out of the same?

A. Of course. Well, that's very important.

Q. And you want this to continue until we have a jury trial?

A. Yes. Yes, it is necessary.

Q. And currently, this last buyer and this new one that's coming will provide you the funds to negotiate, hopefully the bank accepts payment?

A. Yes. He does have the funds.

MR. ROBLES: I'll pass the witness.

MR. TAHERZADEH: Where do you prefer I stand? Back here, or do you prefer I --

THE COURT: You can ask questions from there.

MR. TAHERZADEH: Do you mind if --

C.      Defendant Compass Bank's Amended Answer
CRSupP86-89

FILED
2014-DCL-02962
7/2/2015 5:13:56 PM
Eric Garza
Cameron County District Clerk
By Celso Amaro Deputy Clerk
5929017

**NO. 2014-DCL-02962**

| | | |
|---|---|---|
| MYRNA ELIZABETH DE LUNA MORALES, | § § § | IN THE DISTRICT COURT |
| *Plaintiff,* | § § | |
| vs. | § § | 107TH JUDICIAL DISTRICT |
| LAREDO NATIONAL BANK, D/B/A AS BBVA COMPASS BANK, | § § § | |
| *Defendant.* | § § | CAMERON COUNTY, TEXAS |

## DEFENDANT'S AMENDED ANSWER

COMES NOW Defendant and files this Amended Answer to Plaintiff's First Amended Original Petition, and would respectfully show the court as follows:

## GENERAL DENIAL

1.      Plaintiff filed her First Amended Original [*sic*] Petition on June 11, 2014, in which she made four claims for relief: one claim for relief under the Deceptive Trade Practices Act (DTPA), two breach of contract claims, and one claim for negligence.

2.      Defendant denies each and every, all and singular, of the material allegations in Plaintiff's First Amended Original [*sic*] Petition.

## AFFIRMATIVE DEFENSES

3.      Defendant also asserts the following affirmative defenses and specific denials for each of Plaintiff's claims.

**I.      DTPA Claims**

4.      The claims and causes of action regarding the Deceptive Trade Practices Act (the "DTPA") are barred because Plaintiff contributed to any injury she might have sustained, due to her own default on the terms of the Note and Deed of Trust.  Pursuant to both contracts, Plaintiff agreed

**48**

**86**

PDF created with pdfFactory Pro trial version www.pdffactory.com

to make regular monthly payments to Defendant. However, by her own admission, Plaintiff failed to make certain payments to Defendant, and therefore defaulted on the Note and Deed of Trust. Both contracts outlined the consequences of default, which include foreclosure of Defendant's lien on the subject property. Plaintiff alleges numerous times that she was "willing and able" to pay off the Note in its entirety, yet alleges no facts regarding her tendering of such a payoff to Defendant or Defendant's refusal to accept tendered funds. As Plaintiff remains to this day in default, Plaintiff is solely responsible for the foreclosure of her property.

5. The claims and causes of action regarding the DTPA claims are also barred because Plaintiff has failed to comply with § 17.505 (a) requiring notice of Plaintiff's complaint be sent to Defendant 60 days before filing suit. Plaintiff admits such in her petition, and Plaintiff makes no allegation that she fits either of the two exceptions listed in § 17.505 (b).

6. Even if Plaintiff were able to surpass the hurdles described above, Plaintiff's claim under the DTPA is actually a claim for breach of contract, and as such is not actionable under the DTPA. The conduct Plaintiff complains of are all actions taken pursuant to the terms of the Note and Deed of Trust.

7. First, the Plaintiff alleges that Defendant "engaged in false, misleading, or deceptive acts and practices that Plaintiff relief [*sic*] to her detriment." To support this allegation, Plaintiff, after admitting her default, states that Defendant foreclosed on the property. Plaintiff makes no allegations that Defendant engaged in any false, misleading, or deceptive acts and practices, nor that she relied on any of those acts or practices to her detriment. Plaintiff simply recites that she defaulted on her loan, Defendant then foreclosed, and Plaintiff was somehow injured thereby. The claim is actually a claim for breach of contract, not a DTPA claim.

49

87

PDF created with pdfFactory Pro trial version www.pdffactory.com

8. Second, the Plaintiff alleges that Defendant "engaged in an unconscionable action or course of action that, to Plaintiff's detriment, took advantage of Plaintiff's lack of knowledge, ability, experience, or capacity to a grossly unfair degree." To support this allegation, Plaintiff states that she cannot speak English and "had limited knowledge, intelligence, and capacity to communicate with Defendant." Regardless of the fact that Plaintiff was a business owner and is a Mexican citizen and resident who is sophisticated enough to purchase a vacation home (the subject property) in a foreign country, Plaintiff offers no facts or allegations to link her claimed diminished intelligence and capacity to any behavior or actions taken by Defendant.

## II. Breach of Contract

9. The claims and causes of action regarding breach of contract are barred by the doctrine of repudiation. Plaintiff repudiated the Note and Deed of Trust by failing to make regular monthly payments as promised.

10. The claims and causes of action regarding breach of contract are barred by the doctrine of discharge. Defendant was discharged from performing the Note and Deed of Trust because Plaintiff repudiated both by failing to make regular monthly payments as promised.

## III. Breach of Contract – Trustee's Actions

11. Plaintiff contributed to any injury she might have sustained because she defaulted on the terms of the Note and Deed of Trust. Pursuant to both contracts, Plaintiff agreed to make regular monthly payments to Defendant. However, by her own admission, Plaintiff failed to make certain payments to Defendant, and therefore defaulted on the Note and Deed of Trust. Both contracts outlined the consequences of default, which include foreclosure of Defendant's lien on the subject property.

## IV. Negligence

**50**

88

PDF created with pdfFactory Pro trial version www.pdffactory.com

12.   Plaintiff's claim for negligence fails to state a claim for which relief can be granted. Plaintiff alleges absolutely no facts that outline a proper claim for negligence.

13.   Plaintiff asserts in her petition that Defendant owed her a duty to treat her "fairly and impartially and reasonably" and to "exercise reasonable diligence and care in dealing with Plaintiff."

14.   Plaintiff then asserts that Defendant breached these duties by alleging nothing more than Defendant breached these duties. Plaintiff asserts no facts or evidence outlining how Defendant breached these duties or what injuries Plaintiff sustained resulting from the breach.

15.   Plaintiff also asserts a claim for gross negligence, but Plaintiff provides even less detail regarding this claim – neither statute nor case law, neither fact nor argument.

## CONCLUSION

WHEREFORE Defendant respectfully requests that the Court enter judgment in favor of Defendant and award to Defendant costs of court, attorney's fees, and such other and further relief to which Defendant may be entitled.in law or in equity.

**Dated: July 2, 2015**

Respectfully submitted,


BY: */s/ Selim H. Taherzadeh*
**TAHERZADEH, PLLC**
Selim H. Taherzadeh
st@taherzlaw.com
Texas Bar No. 24046944
Jeremiah B. Hayes
jh@taherzlaw.com
Texas Bar No. 24048532
5001 Spring Valley Road
Suite 1020W
Dallas, Texas 75244
Tel.  (469) 729-6800
Fax. (469) 828-2772

**ATTORNEYS FOR DEFENDANT COMPASS BANK**

51

89

PDF created with pdfFactory Pro trial version www.pdffactory.com

D.      Texas Business and Commerce Code
SUBCHAPTER B. NEGOTIATION TRANSFER, AND
INDORSEMENT  Sec. 3.201 through 3.204
SUBCHAPTER B. NEGOTIATION, TRANSFER, AND
INDORSEMENT

# Texas Business and Commerce Code SUBCHAPTER B. NEGOTIATION TRANSFER, AND INDORSEMENT Sec. 3.201 through 3.204 SUBCHAPTER B. NEGOTIATION, TRANSFER, AND INDORSEMENT

Sec. 3.201. NEGOTIATION. (a) "Negotiation" means a transfer of possession, whether voluntary or involuntary, of an instrument by a person other than the issuer to a person who thereby becomes its holder.

(b) Except for negotiation by a remitter, if an instrument is payable to an identified person, negotiation requires transfer of possession of the instrument and its indorsement by the holder. If an instrument is payable to bearer, it may be negotiated by transfer of possession alone.

Amended by Acts 1995, 74th Leg., ch. 921, Sec. 1, eff. Jan. 1, 1996.

Sec. 3.202. NEGOTIATION SUBJECT TO RESCISSION. (a) Negotiation is effective even if obtained:

(1) from an infant, a corporation exceeding its powers, or a person without capacity;

(2) by fraud, duress, or mistake; or

(3) in breach of duty or as part of an illegal transaction.

(b) To the extent permitted by other law, negotiation may be rescinded or may be subject to other remedies, but those remedies may not be asserted against a subsequent holder in due course or a person paying the instrument in good faith and without knowledge of facts that are a basis for rescission or other remedy.

Amended by Acts 1995, 74th Leg., ch. 921, Sec. 1, eff. Jan. 1, 1996.

E: **Texas Business and Commerce Code Sec. 3.203 through 3.204**

Sec. 3.203. TRANSFER OF INSTRUMENT; RIGHTS ACQUIRED BY TRANSFER. (a) An instrument is transferred when it is delivered by a person other than its issuer for the purpose of giving to the person receiving delivery the right to enforce the instrument.

(b) Transfer of an instrument, whether or not the transfer is a negotiation, vests in the transferee any right of the transferor to enforce the instrument, including any right as a holder in due course. The transferee cannot acquire rights of a holder in due course by a transfer, directly or indirectly, from a holder in due course if the transferee engaged in fraud or illegality affecting the instrument.

© Unless otherwise agreed, if an instrument is transferred for value and the transferee does not become a holder because of lack of indorsement by the transferor, the transferee has a specifically enforceable right to the unqualified indorsement of the transferor, **but negotiation of the instrument does not occur until the indorsement is made.**

(d) If a transferor purports to transfer less than the entire instrument, negotiation of the instrument does not occur. The transferee obtains no rights under this chapter and has only the

rights of a partial assignee.

Amended by Acts 1995, 74th Leg., ch. 921, Sec. 1, eff. Jan. 1, 1996.


Sec. 3.204. INDORSEMENT. (a) **"Indorsement" means a signature**, other than that of a signer as maker, drawer, or acceptor, that alone or accompanied by other words is made on an instrument for the purpose of (i) negotiating the instrument, (ii) restricting payment of the instrument, or (iii) incurring indorser's liability on the instrument, but regardless of the intent of the signer, a signature and its accompanying words is an indorsement unless the accompanying words, terms of the instrument, place of the signature, or other circumstances unambiguously indicate that the signature was made for a purpose other than indorsement. For the purpose of determining whether a signature is made on an instrument, a paper affixed to the instrument is a part of the instrument.

**(b) "Indorser" means a person who makes an indorsement.**

**© For the purpose of determining whether the transferee of an instrument is a holder, an indorsement that transfers a security interest in the instrument is effective as an unqualified indorsement of the instrument.**

(d) If an instrument is payable to a holder under a name that is not the name of the holder, indorsement may be made by the holder in the name stated in the instrument or in the holder's name or both, but signature in both names may be required by a person paying or taking the instrument for value or collection.

F.      Texas Business and Commerce Code 3.302(2)©

E:    Texas Business and Commerce Code 3.302(2)©

Texas Business and Commerce Code 3.302(2) HOLDER IN DUE COURSE,

(c)Except to the extent a transferor or predecessor in interest has rights as a holder in due course, **a person does not acquire rights of a holder** in due course of an instrument taken:
(1)  by legal process or by purchase in an execution, bankruptcy, or creditor's sale or similar proceeding;
(2)  by purchase as part of a bulk transaction not in ordinary course of business of the transferor;  **or**
**(3)  as the successor in interest to an estate or other organization.**

F.  Note *
(Showing no negotiation)

*Only  only one page of the note has been  provided to Appellee in discovery.

The undersigned hereby certifies the following to be a true and correct copy of the original. Rio Grande Valley Abstract Co., Inc.

By _____

# NOTE

| | | |
|---|---|---|
| **JANUARY 24, 2006** [Date] | **LAREDO** (City) | **TEXAS** [State] |

**6503 FOUNTAIN WAY, SOUTH PADRE ISLAND, CAMERON COUNTY, TEXAS 78597**
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $291,200.00 (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is **THE LAREDO NATIONAL BANK.** I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 7.000%.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3. PAYMENTS

(A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the 1st day of each month beginning on **MARCH 1, 2006.** I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on **FEBRUARY 1, 2036,** I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at **600 SAN BERNARDO AVE., LAREDO, TEXAS 78040** or at a different place if required by the Note Holder.

(B) Amount of Monthly Payments

My monthly payment will be in the amount of U.S. $1,937.37.

## 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying any prepayment charge. The Note Holder will use all of my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

## 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note

1

MULTISTATE FIXED RATE NOTE—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
L:\01 TRES\PACKAGES, 2006\ Morales, Myrna Elizabeth - $291,200.00

Form 3200 1/01
Initials _MERM_



G. Transfer of Lien

00009479

CERTIFIED COPY

Recording Requested By:
REGIONS MORTGAGE

When Recorded Return To:

SANDRA MCALPIN
REGIONS MORTGAGE
215 FORREST STREET
P O BOX 18001
HATTIESBURG, MS 39401

**PLEASE RETURN RELEASE OR TRANSFER OF LIEN FOR RECORDING TO:**
**RIO GRANDE VALLEY ABSTRACT CO., INC.**
**5800 PADRE BLVD, SUITE 115**
**SOUTH PADRE ISLAND, TX 78593**
**GF #** 2020469611 SPI

**TRANSFER OF LIEN**

REGIONS BANK DBA REGIONS MORTGAGE #:0000595024505 "MORALES"  Lender ID:W04/001/0595024505  Cameron, Texas

Holder of Note and Lien:  REGIONS BANK SUCCESSOR BY MERGER WITH UNION PLANTERS BANK, NATIONAL ASSOCIATION AKA UNION PLANTERS BANK, N A
Holder's Mailing Address: 215 FORREST, HATTIESBURG, MS 39401
Transferee:  THE LAREDO NATIONAL BANK
Transferee's Mailing Address: 5800 PADRE BLVD, SUITE 115, SOUTH PADRE ISLAND, TX

Note:
Date:  09/30/2002
Original Amount:  $300,700.00
Maker:  MYRNA ELIZABETH DE LUNA MORALES
Payee:  UNION PLANTERS BANK, N.A.
Unpaid Principal and Interest:  $0.00

NOTE AND LIEN ARE DESCRIBED IN THE FOLLOWING DOCUMENTS, RECORDED IN:

Deed of Trust Recorded on _____ in Book/Reel/Liber: 8390 Page/Folio: 45 as Instrument No.: N/A  in said county.

Legal Description: As Referenced on Original Recorded Document
Property Address:  6503  FOUNTAIN WAY, SOUTH PADRE ISLAND, TX  78597

For value received Holder of Note and Lien transfers them to Transferee, warrants that the lien is valid against the property in the priority as insured.

REGIONS BANK SUCCESSOR BY MERGER WITH UNION PLANTERS BANK, NATIONAL ASSOCIATION AKA UNION PLANTERS BANK, N A
On February 3rd, 2006

By: _____
BRAD ALLEN, Assistant Vice-President

*T_J*T_JUNPL*02/03/2006 10:13:03 AM* UNPL01UNPL000000000000000000222247* TXCAMER* 0000595024505 TXSTATE_LIEN_REL *T_J*T_JUNPL*

Doc
00009479 Bk Vol
OR 12273
Pg
297

**56**

TRANSFER OF LIEN Page 2 of 2

STATE OF Mississippi
COUNTY OF Forrest

On February 3rd, 2006, before me, PATSY L. WELBORN, a Notary Public in and for Forrest in the State of Mississippi, personally appeared BRAD ALLEN, Assistant Vice-President, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity, and that by his/her/their signature on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal,

PATSY L. WELBORN
Notary Expires: 06/07/2009

*T_J*T_JUNPL*02/03/2006 10:13:03 AM* UNPL01UNPL00000000000000000222247* TXCAMER* 0000595024505 TXSTATE_LIEN_REL *T_J*T_JUNPL*

Doc 00009479 Bk OR Vol 12273 Pg 298



State of Texas
County of Cameron
I, Sylvia Garza-Perez, County Clerk of
Cameron County, Texas, do hereby certify
that the foregoing is a true and correct
copy of the original record now on file
and/or recorded by me in the
_____ Records, Volume _____
_____ pages(s)

_____ Date

SYLVIA GARZA-PEREZ, COUNTY CLERK
Cameron County, Texas

By_____ Deputy



FILED AND RECORDED
OFFICIAL PUBLIC RECORDS
On: Feb 16,2006 at 04:22P

Document Number: 00009479

Part Time
By
Joe G Rivera, County Clerk
Cameron County

Doc
00009479 Bk Vol OR 12273 Pg 299

H.      Modification and Extension Agreement

00001732

Return To:
Compass Bank
P. O. Box 10687
Birmingham, AL 35202-0687

Prepared By:
Polunsky & Beitel, LLP
8000 McDermott Freeway, Suite 1600
San Antonio, Texas 78230

Account No. 0002658287
App ID No. 7068571 -21 RE

[Space Above This Line For Recording Data]

## MODIFICATION AND EXTENSION AGREEMENT

| | | |
|---|---|---|
| THE STATE OF TEXAS | } | |
| | } | KNOW ALL MEN BY THESE PRESENTS: |
| COUNTY OF CAMERON | } | |

WHEREAS, Myrna Elizabeth De Luna Morales (herein "Borrower") executed and delivered unto The Laredo National Bank, that one certain Note (herein the "Note") in the original principal sum of $291,200.00 dated January 24, 2006, payable to the order of The Laredo National Bank, which Note was secured by a Deed of Trust (herein the "Deed of Trust"), recorded in Volume 12199, Page 142, Official Public Records of Cameron County, Texas, encumbering the real property and improvements thereon (herein the "Property") described in said Deed of Trust, and being more particularly described in Exhibit "A" attached hereto and made a part hereof for all purposes; and,

WHEREAS, Compass Bank (herein "Lender") is now the owner and holder the herein described liens; and,

WHEREAS, the current amount due and owing under the Note is $289,019.72 which includes all unpaid past due escrow and unpaid late charges; and,

WHEREAS, Borrower has requested Lender to modify the terms of the Note, and Lender has agreed, in exchange for Borrower's agreements herein set forth, to a modification of the Note upon the terms hereinafter set forth;

NOW, THEREFORE, for and in consideration of the mutual agreements herein set forth, and the other considerations herein expressed, Lender and Borrower hereby agree to the following modifications of the Note, and Borrower hereby renews the Note, and all outstanding indebtedness secured by the Note and the Deed of Trust, and in consideration for the modifications of the Note by Lender; Borrower and Lender hereby expressly agree as follows:

- 1 -

c:msw:mort:Mod and Ext Agrmt-Compass Bank-Morales, Myrna Elizabeth De Luna-$291,200

Account No. 0002658287
App ID No. 7068571

1. Borrower and Lender acknowledge that the Modifications herein adopted are effective as of December 1, 2011.

2. Borrower and Lender acknowledge that the outstanding principal balance of the Note as of the date hereof is $289,019.72 which includes all unpaid past due escrow and unpaid late charges.

3. The Maturity Date of the Note is changed from February 1, 2036 to June 1, 2039.

4. The interest rate is changed from 7.000% per annum to a fixed rate of 3.000% per annum until June 1, 2039 ("Maturity Date") at which time all unpaid principal and accrued unpaid interest shall be due and payable.

5. The monthly principal and interest payment is changed to $1,287.25 per month payable on the 1st day of each and every month, beginning January 1, 2012, until June 1, 2039 ("Maturity Date"), at which time all unpaid principal and accrued unpaid interest shall be due and payable.

6. In addition to the monthly payments of principal and interest, Borrower shall continue to pay monthly along with each monthly principal and interest payment the funds for the escrow items, as provided in the Mortgage securing the payment of this Note.

7. The amount payable for the escrow items to be paid along with the principal and interest payment in the amount of $1,287.25 beginning January 1, 2012, shall be $1,109.09 monthly for a total of principal and interest and escrow items being $2,396.34. The escrow amount is subject to change.

8. All other terms of the Note not specifically modified by nor in conflict with the terms of this Modification Agreement shall remain in full force and effect.

It is the intention of the parties hereto to strictly conform to the applicable usury laws, all agreements between Borrower and the Lender, whether now existing or hereinafter arising, and whether written or oral, are hereby expressly limited so that in no event, whether by reason of acceleration of the maturity of the Note, or otherwise, shall the amount paid or agreed to be paid to the holder of the Note for the use, forbearance, or other detention of the money under the Note, as modified hereunder, or otherwise exceed the maximum amount permissible under applicable law. If fulfillment of any provision of the Note, as modified hereby, or of any Deed of Trust or other document evidencing or securing the indebtedness evidenced by the Note at the time the performance of such a provision shall be due, shall involve transcending the limit of validity prescribed by law, then, ipso facto, the obligation to be fulfilled shall be reduced to the limit of such validity; and if the holder of the Note shall ever receive anything of value deemed interest under applicable law, which would exceed interest at the highest lawful rate, an amount equal to any

- 2 -

**60**

excessive interest shall be applied to the reduction of the principal amount owing under the Note, as modified herein, and not to the payment of interest, or, if such excessive interest exceeds the unpaid balance of principal of the Note, as modified hereby, such excess shall be refunded. All sums paid, or agreed to be paid, to the holder of the Note for the use, forbearance or other detention of the indebtedness of the obligor thereunder, to the holder of the Note, shall, to the extent permitted by applicable law, be amortized, prorated, allocated and spread throughout the full stated term of such indebtedness so that the rate of interest on account of such indebtedness is uniform throughout the term thereof. The provisions of this paragraph shall control all agreements between the obligors under the Note and the holder of the Note.

In consideration of Lender's consent to the modification of the Note, as herein provided, Borrower further hereby releases, relinquishes and forever discharges Lender, as well as its predecessors, successors, assigns, agents, officers, directors, employees and representatives of and from any and all claims, demands, actions and causes of action of any and every kind or character, whether known or unknown, present or future, which Borrower may have against Lender, and its predecessors, successors, assigns, agents, officers, directors, employees and representatives, arising out of or with respect to any and all transactions relating to the Note, and any Deed of Trust given in connection therewith, occurring prior to the date hereof.

Borrower hereby agrees that the modification contained herein shall in no manner impair the Note, the repayment of the indebtedness evidenced thereby, the Deed of Trust, any lien securing the Note, or any loan documents controlling the disbursement of loan funds; Borrower hereby expressly acknowledging the validity and enforceability of the Note as herein modified and the indebtedness evidenced thereby; the purpose of this instrument being simply to modify the terms of the Note as hereinabove stated. Borrower further acknowledges that liens securing the Note are not in any manner waived and are valid and subsisting. Borrower further agrees that, in the event of a default under the Note, nothing contained herein shall preclude the holder of the Note from foreclosing the lien of the Deed of Trust or enforcing, in accordance with their terms, any other instruments evidencing or securing the indebtedness evidenced by the Note.

This document constitutes a "written loan agreement" pursuant to Section 26.02 of the Texas Business and Commerce Code, if such Section applies.

THIS WRITTEN LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF

c:msw:mort:Mod and Ext Agrmt-Compass Bank-Morales, Myrna Elizabeth De Luna-$291,200

**61**

Account No. 0002658287
App ID No. 7068571

PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE
PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE
PARTIES.

EXECUTED on this the 28th day of december, 2011, but EFFECTIVE as of the 1st
day of December, 2011.

BORROWER:

_Myrna Eddejuna M._

Myrna Elizabeth De Luna Morales

LENDER:

COMPASS BANK

By: _Jimmy Justice_

Its: _Commercial Underwriter_

Schedule of Attachments:

Exhibit "A" - Description of Property.

THE STATE OF _____ }
                         }
COUNTY OF _____ }

This instrument was acknowledged before me on this the 28th day of december,
2011, by Myrna Elizabeth De Luna Morales.

Notary Public, in and for
The State of -0-0-0-0

Stephen F. LeCompte
Vice Consul
Monterrey, Mexico

Notary Stamp - Name of Notary and Date
Commission Expires: -0-0-000

- 4 -

Account No. 0002658287
App ID No. 7068571

THE STATE OF _al_     }
                        }
COUNTY OF _Jefferson_     }

This instrument was acknowledged before me on this the _3rd_ day of _January_, 2012, by _Jimmy Justice_, _Commercial Underwriting_, of COMPASS BANK, an Alabama State Bank, on behalf of said Bank.

_Kimberly A. Slaughter_
Notary Public, in and for
The State of _Alabama_

Notary Stamp - Name of Notary and Date Commission Expires: _04-05-2014_

- 5 –

c:msw:mort:Mod and Ext Agrmt-Compass Bank-Morales, Myrna Elizabeth De Luna-$291,200

**63**

Account No. 0002658287
App ID No. 7068571

EXHIBIT "A"

Lot Number Thirty-five A (35A), Block Number Three (3), The Villas of South Padre, Town of South Padre Island, Cameron County, Texas, according to the Map recorded in Cabinet I, Slot 1594-B and amended in Cabinet I, Slot 1697-A, Map Records of Cameron County, Texas;

Which currently has the address of 6503 Fountain Way, South Padre Island, Cameron County, Texas 78597.

- 6 -

c:msw:mort:Mod and Ext Agrmt-Compass Bank-Morales, Myrna Elizabeth De Luna-$291,200

**64**

Doc     Bk    Vol    Pg
00001732 OR 18245    89


FILED AND RECORDED
OFFICIAL PUBLIC RECORDS
On: Jan 17,2012  at  12:59P

Document Number:        00001732

By
Lamar Cantu
Joe G Rivera, County Clerk
Cameron County